CASE 44—PETITION ORDINARY—FEBRUARY 25.

# Tudor vs. Lewis, &c.

### APPEAL FROM MADISON CIRCUIT COURT.

Error of the circuit court in granting or refusing to grant instructions, unless excepted to at the time, will not avail for a new trial below, nor for reversal in the court of appeals. (2 *Met.*, 538, 559.)

Officers of courts are held to good faith and reasonable diligence in taking care of property placed in their hands, pending process and proceedings. And if the property is lost by any negligent or dishonest execution of their trust, they are liable in damages. The degree of diligence which they are bound to exert in the custody of property placed in their hands, in virtue of their office, or over which the law gives them control, is such ordinary diligence as belongs to a prudent man and an honest discharge of their duties, and such as is required of all persons who receive compensation for their services.

It is the duty of a constable arresting a slave under a warrant for a criminal charge, after the arrest, and while the slave is under his control and keeping, to exercise such diligence in watching and guarding him, in order to prevent his escape, as an ordinarily prudent man, under like circumstances, would exercise in taking care of property of a similar description; and, if he fails to do this, and in consequence of such failure or neglect the slave escapes, and is thereby lost or destroyed, the owner will have the right to look to the constable and his sureties in his official bond, for any damages resulting to the owner from such neglect.

In an action against an officer for suffering a slave in his custody to escape, whereby he was lost to the owner, that the degree of misconduct and negligence charged in the petition, and put in issue by the answer, is beyond the proper test, neither imposes upon the plaintiff the necessity of proving any greater negligence than that which the law prescribes, nor relieves the court from the duty of defining what amount of neglect is necessary to charge the officer.

"Gross negligence" and "fraud" are not, in law, equivalent or convertible terms. Gross negligence may furnish evidence of fraud, and of a violation of that good faith

that the law presumes to exist in every contract of bailment; but it does not amount to actual or intentional fraud.

The criterion of damages, in an action by the owner of the life estate in a slave against a constable for negligently suffering the slave to escape from his custody, while under arrest upon a criminal charge, whereby the slave was lost to the owner, is the value of the life estate.

C. F. Burnam and E. J. Broaddus, for appellant, cited *Rev. Statutes*, 16th *article, sections* 1 *and* 2, *page* 263; *Morgan's Vade Mecum, vol.* 1, *page* 164; 1 *Comyn's Dig.*, 414, 415; 1 *Salkeld*, 17, 18; 6 *Johns.*, 62; 9 *Ib.*, 329; *Story on Bailments, sec.* 620; *Jones on Bailments, page* 22; 7 *B. Mon.*, 163; 12 *B. Mon.*, 410 *to* 420.

Turner, for appellees, cited *Rev. Statutes, page* 377, *section* 2, *title Guards.*

Caperton, on same side, cited *Rev. Statutes, page* 377, *sec.* 2; *Criminal Code, sec.* 30.

CHIEF JUSTICE STITES DELIVERED THE OPINION OF THE COURT:

This suit was brought against a constable and his sureties, for the value of a slave, charged to have been lost to the owner in consequence of the misconduct and negligence of the constable, whilst in the discharge of his official duties.

The petition, after setting out the official bond, proceeds to show a breach thereof in substance as follows:

"That said Lewis, after his appointment and qualification as constable, under some pretended writ issued by Thos. Boone, a justice of the peace for Madison county, forcibly took from the plaintiff her negro slave, Richard, and without her knowledge or consent detained him in his custody about forty hours, said slave being, as she is informed, charged with the crime of *stealing*.

"That, after the slave was so taken from her possession, said Lewis, by his *culpable* negligence and *gross misconduct*, allowed persons to talk and converse with said slave, and threaten him with hanging, and frighten him; and that, afterwards, by his culpable negligence and inattention in failing to have said slave kept and guarded, he suffered said slave to escape and drown himself in the Kentucky river.   Wherefore, &c."

The answer admits the execution of the bond, but denies the alleged breach, and goes on, in response to the specific charges, to say :

"They state that on the — day of December, 1858, Thomas Boone, then and still a justice of the peace for Madison county, issued a warrant against the slave Richard, charging him with the *commission of a felony;* which warrant was placed in the hands of defendant, Lewis, as constable of said county, to execute ; that, in compliance with the directions of said warrant, and in discharge of his duty as constable, he did arrest said slave Richard.

"The said slave was not at the time in plaintiff's possession, nor was he, so far as they know or believe, her property, nor did said Lewis detain said slave in his custody forty hours.

"They state that said Lewis, in obedience to said warrant, took said slave as soon as he conveniently could after the arrest, before the said justice of the peace, and summoned five citizens of Madison county to assist in guarding said slave. Two of them attended at Boone's house, in said county, with the constable Lewis, when he took the slave to said justice's. On defendant Lewis' taking said slave to Boone's, he, said Boone, stated that it was necessary to have another justice of the peace to sit with him on the trial of the slave, and, it being necessary for defendant Lewis to summons witnesses, he left the slave with Boone and the two persons summoned as a guard, to take care of said slave, and went off, as it was his duty to do, to summon witnesses to attend the trial ; and another person went, or agreed to go, to get another justice to assist on the trial.

"That, during the period the defendant Lewis was so necessarily absent, and before he returned to Boone's, the said slave escaped.   In what manner he escaped, or how he came to his death, they do not know."

The answer then proceeds to deny specifically the charges of misconduct and culpable negligence of the officer in any way, and also controverts any liability for the conversations and threats of others, &c.   It also denies that the death of the

slave, or his loss, was the immediate or proximate result of any of the acts or omissions of the constable.

Upon the issues thus presented the parties went to trial, and a verdict and judgment having been rendered for the defendant, the plaintiff has brought the case up—complaining, mainly, of error of the court in allowing and refusing instructions.

The evidence conduced to show that the slave was charged with some public offense—whether a felony, or mere larceny, punishable with stripes, does not appear, as the warrant is not contained in the bill of exceptions. That he was arrested and taken to Boone's on the same day. That he was kept there all night, and, on the next morning, about 10 o'clock, made his escape, going towards the Kentucky river, which was only a short distance off. That his body was soon afterwards found in the river, near the crossing place, where it was supposed he was drowned. No one saw him drowned, and it did not appear whether the death was accidental or intentional.

There was some evidence of carelessness in watching the boy, both at night and in the morning; and also evidence showing that persons had frightened him as to the consequences of the offense with which he stood charged. It appeared, also, that the constable had left the slave at Boone's in charge of others, whilst he was off summoning witnesses, and that he escaped before Lewis' return.

The evidence, in regard to the number of persons summoned as guards, and also as to the amount of care observed in watching the boy, was somewhat varied and contradictory.

The value of the slave was proved, and it also appeared that the plaintiff owned but a life estate in him.

Upon the foregoing facts the plaintiff and defendant both moved several instructions, which were refused. But, as no exceptions were taken at the time to the refusal, we need not stop to notice them. For, as held by this court in *Kennedy vs. Cunningham*, and *Letton vs. Young*, (2 *Met.*,) error of the circuit court in granting or refusing to grant instructions, unless excepted to at the time, will not avail for a new trial below, nor for reversal here.

The court however gave the following instructions, which were excepted to by the appellant, and of which, as already said, complaint is made.

"The court instruct the jury that, if they believe, from the evidence, that on the 23d December last the negro man slave, Richard, then being the property of the plaintiff, was arrested by the defendant Lewis, as constable of Madison county, on a charge of stealing, and taken into his custody, and that, after said arrest, said slave was, by the culpable negligence *or fraud* of said Lewis or his guards, permitted to escape, and did escape, and was thereby lost to the plaintiff before said boy had been tried, and before the possession of him had been restored to the plaintiff, then they should find for the plaintiff a verdict in damages, equal to the injury sustained.

"If they shall believe, from the facts, that the defendant Lewis, nor his guards, were not guilty of *gross* neglect of duty, nor *fraud* in not taking care of the said slave after his arrest, they ought to find for the defendants.

"If they believe, from the evidence, that the plaintiff only had a life estate in the slave, they cannot, in any event, find for the plaintiff more than the value of that life estate."

The objection to the first and second instructions is, that they do not define properly the degree of care which the officer was bound to take of the slave, whilst in his keeping or under his charge; and, in our opinion, the objection is well taken.

It is true that the officer, in arresting the slave, was acting in strict obedience to the warrant, and would have been guilty of a violation of duty had he refused to execute the same. But he was compensated by law for the performance of such duty, and he owed it alike to the public and the owner of the slave to exercise at least reasonable and ordinary diligence in watching and guarding the slave to prevent his escape either from punishment or the control of the owner.

It would be singular, indeed, to permit an officer thus to deprive a citizen of the possession of his slave, and of all control over him, and yet not hold the officer responsible for the

exercise of reasonable care and diligence in preventing his escape both from the law and the owner.

Had the slave been convicted of felony, as charged in the answer, and sentenced to death, the owner would have been clearly entitled to compensation. Yet, if the doctrine in the second instruction be correct, the owner may have been as effectually deprived of his property, by the want of reasonable diligence on the part of the officer in not guarding him and preventing his escape, and still without any remedy for his loss against the officer, although in his custody and awaiting the preliminary examination necessary, perhaps, to the conviction and punishment.

The rule, as we take it, is otherwise, both upon principle and authority.

According to the civil law, in cases of deposits made by order of a court, or, as they are called, judicial sequestrations, wherever the depository receives a compensation he will be liable, like other persons for hire, for ordinary diligence. (*Story on Bailments*, sec. 46, *and the authorities there cited.*)

And so it is said in respect to officers of courts. They are held to good faith and reasonable diligence in taking care of property placed in their hands pending process and proceedings. And, if the property is lost by *any* negligent or dishonest execution of their trust, they are liable in damages.

The degree of diligence which they are bound to exert in the custody of property placed in their hands, in virtue of their office, or over which the law gives them control, is such ordinary diligence as belongs to a prudent man, and an honest discharge of their duties, and such as is required of all persons who receive compensation for their services. (1 *Mason Rep.*, 96, 100 ; 6 *Rob.*, 142 ; *Story on Bailments, section* 620.)

This court has often recognized the liability of sheriffs and other officers for negligence in taking care of property levied on, or otherwise coming to their hands in virtue of their office. (2 *Marshall*, 567 ; 4 *Bibb*, 494.) But in no case, that we have seen, has it ever tolerated the idea that such officers, who are the legal custodians of the property, should be held to a less degree of care and diligence in taking care of it than that al-

ready stated.   Indeed, the bond itself which is exacted of the officers, seems to require that reasonable diligence should be exercised by them in the performance of every duty which pertains to the office they hold.   It stipulates, in so many words, that the person appointed shall "in all things *faithfully and truly* execute and perform the duties of his office."

We are of opinion, therefore, that it was the duty of the constable in this case, after the arrest of the slave, and whilst under his control and keeping, to have exercised such diligence in watching and guarding him, in order to prevent his escape, as an ordinarily prudent man, under like circumstances, would exercise in taking care of property of a similar description.   And, if he failed to do this, and, in consequence of such failure or neglect, the slave escaped, and was thereby lost or destroyed, that, then, appellant would have the right to look to him and his sureties in his official bond for any damages resulting to her from such neglect.

The degree of misconduct and negligence charged in the petition, and put in issue by the answer—though somewhat ambiguous—is certainly distinct and broad enough to embrace the degree herein indicated as the proper criterion in this case. And the fact that it goes beyond the proper test, or may be so construed, neither imposed upon appellant the necessity of proving any greater negligence than has been stated, nor relieved the court from the duty of defining what amount of neglect was necessary to charge the officer.

The first instruction fails to define properly the criterion of diligence imposed upon the officer in such cases, or of neglect that would make him liable.   The second is still more objectionable in regard to this point, because, by saying that the officer would only be liable for *gross* neglect, it virtually relieves him from the observance of ordinary and reasonable diligence in the discharge of his official duty.   And both instructions are liable to still another objection—that is, in submitting an inquiry to the jury respecting the fraud of the officer, even admitting the criterion of neglect therein laid down to be proper, which is denied.

The terms "gross neglect" and "fraud," as used in the instructions, were doubtless used as convertible, and as signifying the same thing. This is evident from the fact that no charge of fraud is made in the petition, and consequently no issue of that character is formed, unless made by the charge of gross neglect.

That gross negligence is equivalent to fraud, or that the terms are convertible, and mean in law the same thing, cannot be admitted. Gross negligence may furnish evidence of fraud, and of a violation of that good faith that the law presumes to exist in every contract of bailment. But that it amounts to actual or intentional fraud, or, in other words, is a *quasi* crime, as fraud is sometimes termed, is a doctrine clearly opposed to reason and authority. Gross negligence, on the contrary, may be, and often is, consistent with good faith and honesty of intention. (14 *Serg. and Rawle*, 275–80; *Story on Bailments, sections* 19, 22, *and authorities there cited*.)

And, as said by Judge Story in his work on Bailments, *supra*, "to confound the terms 'gross negligence' and 'fraud' might be most mischievous error."

For, then, unless a jury should believe the party guilty of fraud, no *laches*, however great, would equal the legal idea of gross negligence, so as to entitle a sufferer by the loss to recovery.

A case is put which illustrates the consequences that might result from such confusion and error:

"A man might leave a casket of jewels or a purse of gold upon the table of a public inn, and a jury might be well satisfied that it was gross negligence, resulting from mere thoughtlessness. But if fraud were a necessary ingredient, the very statement of the case would negative any right of recovery. The law however does not necessarily include in the notion of gross negligence any admixture of fraud—at least of intentional fraud."

The case just stated illustrates well the objection last taken to the instructions complained of. The jury may have deemed it essential to a recovery that the plaintiff should have established some actual fraudulent intent on the part of the officer,

VOL. 3—25

and, having no evidence of such intent, found for the defendants, without regard to the evidence of neglect.

No objection is perceived to the last instruction, which limits plaintiff's recovery to the value of her estate in the slave ; but, for the errors pointed out in the other instructions, the judgment is *reversed*, and cause remanded for a new trial and further proceedings not inconsistent with this opinion.