# HYER *v.* RICHMOND TRACTION COMPANY.

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE FOURTH CIRCUIT.

No. 379. Submitted October 18, 1897. — Decided December 6, 1897.

Hyer and Shield were engaged separately, each on behalf of himself and his associates, in seeking from the city government of Richmond a concession for a street railway with collateral lines. Hyer's organization was to be called the Richmond Conduit Company, and Shield's the Richmond Traction Company. Hyer made a deposit of money in a bank in Richmond to aid in his projects. Hyer and Shield then contracted in writing as follows, each being fully authorized thereto by his associates: "We

hereby bind ourselves, in our own behalf and for our associates, mutually to coöperate one with the other in securing a franchise for said railway and to divide equally between us and our associates whatever may be realized from the enterprise, first deducting from said amount whatever actual expenses may have been incurred by either side, such expenses to be paid out of the first money realized from said enterprise. The deposit already made with the State Bank of Richmond, by Hyer or his associates, is to stand and remain intact as it now is for the purpose of securing the franchise aforesaid, subject to any conditions for the withdrawal thereof made by Hyer with the depositor after the seventeenth day of August, 1895; and further, it is agreed that the application and franchise to be presented to the common council of the city of Richmond shall be that of the Richmond Traction Company, for the building of an overhead trolley railway or cable system." A full statement of the action of the two companies was made to the Richmond authorities. Hyer fully performed his agreements. He was unable to go to Richmond when the matter was settled, and Shield secured the concession for himself and his associates, and refused to permit Hyer and his associates to participate in it. By bill in equity, amended bill and supplemental bill, Hyer sought to be declared owner of one half interest in the Traction Company's franchise, property and stock, and for a decree securing the possession and enjoyment thereof. *Held*, that, without deciding whether the contract sued on was, under the facts and circumstances disclosed, void as against public policy, the case presented was not one which called for the interposition of a court of equity; but that the plaintiff's remedy was by an action at law.

ON October 30, 1895, appellant, as plaintiff, filed his bill against the defendants in the Circuit Court of the United States for the Eastern District of Virginia. After some changes, he, on April 18, 1896, filed an amended and supplemental bill. The sufficiency of this was challenged by demurrer. The demurrer was sustained, and on August 22 a decree was entered dismissing the bill. From that decree the plaintiff appealed to the Court of Appeals, which court, on May 14, 1897, ordered that the decree of the Circuit Court be affirmed, without prejudice. Whereupon the case was removed to this court by certiorari.

It appears from the allegations in the amended and supplemental bill that the plaintiff, whose attention had been for some time devoted to the matter of street railways in the city of Richmond, Virginia, succeeded in obtaining from the city council a franchise for the construction and operation of a

street railway on Broad street, in that city. An ordinance, passed on June 17, granted the franchise to the plaintiff and his associates under the name and style of the Richmond Conduit Company. The terms of this ordinance differed in some respects from those of the one prepared by the plaintiff, who declined to accept it or to proceed under it in the form in which it had passed the council. But upon an open conference with the committee on streets of the city council plaintiff was assured that changes would be made rendering the franchise acceptable to him, provided he would deposit in one of the banks of the city of Richmond the sum of ten thousand dollars, upon certain conditions embodied in a paper, prepared by the city attorney. On July 17 he caused the deposit to be made, and gave satisfactory guarantees of the good faith of himself and associates, and of their purpose to construct the railway, which guarantees, as he was assured, would secure the modification of the grant in accordance with his suggestions. While in Richmond, and conferring with the various committees of the city council with regard to this franchise, he became aware that certain other parties were seeking to secure a grant of a like franchise to them, under the name and style of the Richmond Traction Company, and that the defendant, P. B. Shield, was apparently the head of this movement, but he had not been successful in obtaining the passage of any ordinance by the city council. In the early part of August, 1895, the plaintiff went to the city of New York, to make arrangements for constructing the railway as soon as the amendments had been made to the ordinance. While there he was in the banking house of Stewart & Co., who had been advising with him with a view of aiding him financially in the prosecution of his enterprise, and there ascertained that the defendant Shield was also in conference with the said firm of Stewart & Co., seeking aid in the prosecution of his Richmond Traction Company scheme. Stewart & Co. advised the consolidation of the two interests, to wit, the interest of plaintiff and his associates in the Conduit Company with that of Shield and his associates in the Traction Company. After some conferences a contract was entered into between plaintiff and Shield, which took the

form of a joint letter to the banker, of which the following is a copy :

"NEW YORK, *August 9th,* 1895.

"S. H. G. Stewart, Esq., 40 Wall street, city.

"DEAR SIR : We, the undersigned, L. H. Hyer, of Washington, D.C., and Phil. B. Shield, of Richmond, Va., have this day entered into the following agreement: That both of us being interested in the procuring of a franchise for and the construction of a street railway on Broad street, in the city of Richmond, Virginia, with collateral lines, have made the following agreement: That we hereby bind ourselves, in our own behalf and for our associates, mutually to coöperate one with the other in securing a franchise for. said railway and to divide equally between us and our associates whatever may be realized from the enterprise, first deducting from said amount whatever actual expenses may have been incurred by either side, such expenses to be paid out of the first money realized from said enterprise.

"It is further agreed between us that the deposit already made with the State Bank of Richmond, at Richmond, Virginia, by Mr. L. H. Hyer or his associates, is to stand and remain intact as it now is for the purpose of securing the franchise aforesaid, subject to any conditions for the withdrawal thereof made by Mr. Hyer with the depositor after the seventeenth day of August, 1895 ; and further, it is agreed that the application and franchise to be presented to the common council of the city of Richmond shall be that of the Richmond Traction Company, for the building of an overhead trolley railway or cable system.

"Among ourselves we will decide what names are proper to be used in the franchise and the policy we will use in procuring the same.

"Yours very respectfully,

"(Signed)  L. H. HYER.

"(Signed)  PHIL. B. SHIELD.

Plaintiff was authorized to act for himself and associates, and the defendant Shield represented that he had a power of

attorney from all parties interested in the traction company
scheme, and he did actually represent them.

It was agreed between the parties to this contract that a
full statement and explanation of the action of the two com-
panies should be made to the city authorities of Richmond,
and in fact it was so made. Plaintiff fully performed all the
promises and covenants entered into in said contract in behalf
of himself and his associates, but being detained by a serious
illness was unable to proceed immediately to Richmond, and
trusted to the defendant Shield and his associates to carry out
other terms of the contract and secure the franchise for the
mutual benefit of both interests. Disregarding this contract,
Shield and his associates secured the passage of an ordinance
granting the franchise to them, and wholly ignoring plaintiff
and his associates. The first section of this ordinance provides:
" That the Richmond Traction Company, composed of John
W. Middendorf, John L. Williams, Everett Waddey, Reuben
Sherreffs, Philip B. Shield, Charles T. Child and W. F. Jen-
kins, be, and the same is hereby, permitted to construct and
operate a street railway within the limits of the city, along
the following routes, under and subject to the conditions and
provisions hereinafter set forth : A double track in Broad
street," etc. Subsequent sections cast various obligations upon
the company in respect to the construction and operation of
the railway, the use by other companies of the tracks, and the
payment of a certain per cent of the gross receipts into the
treasury of the city. The last section is as follows :

"Fourteenth. Said Richmond Traction Company, and all
such persons as now compose said company, or who may here-
after unite with them, are, in virtue of the authority vested in
the common council of Richmond, pursuant to the act of the
General Assembly of Virginia, passed March 20, 1860, entitled
'An act to authorize the common council of Richmond to au-
thorize persons to construct railroads in the streets of said city,'
declared to be a corporation, and are vested with all the rights
and privileges conferred, or intended to be conferred, by said
act on persons or companies authorized by said council of the
city of Richmond to construct railroads in the streets of said

city, and are likewise bound by all the restrictions of said act."

All the parties named in the first section of this ordinance were duly notified of the claims of plaintiff and his associates, under the contract of August 9 : notwithstanding which they ignored plaintiff and his associates, and proceeded to organize a corporation, taking all the stock to themselves, paying nothing therefor, but receiving certificates purporting to be of fully paid stock. Plaintiff, after alleging that he is the holder of all the interests represented by himself and his associates, prayed that he be decreed the owner of one-half interest in the Traction Company's franchise, property and stock, and specifically for certain orders to secure to him the possession and enjoyment of such interest.

*Mr. Robert Stiles* and *Mr. Addison L. Holladay* for Hyer.

*Mr. W. W. Henry, Mr. Edmund Randolph Williams, Mr. S. D. Schmucker* and *Mr. George Whitelock* for the Richmond Traction Company.

MR. JUSTICE BREWER after stating the case, delivered the opinion of the court.

Two questions arise in this case : First, whether the contract sued on is, under the facts and circumstances disclosed in the bill, void as against public policy ; and, if not, whether the case presented is one which calls for the interposition of a court of equity, or should be determined in a court of law.

In respect to the first question, it will be borne in mind that upon a demurrer, whatever the facts in the case may really be, we must take them to be as stated in the bill. So, in determining the question of the validity of this contract it must be assumed that there was no concealment; that everything was open and public ; and nothing withheld from the knowledge of the city council, or any parties interested in the matter. The case thus presented is : Two parties apply separately to a city council for a franchise to construct a street railway. The banker from whom each of the parties is seeking

financial assistance advises them to unite and make a single application. They do so, and thereafter the city council, aware of both interests, of the two applications, of the advice to consolidate and the party by whom it is given, and of all the terms of the consolidation, grants the franchise to only one of the parties. Was the agreement to unite in one application against public policy and void?

In the view we have taken of the second of these questions it is unnecessary to definitely determine the answer which should be given to the first, though it may not be inappropriate to observe that the vice which is so frequently detected in contracts and agreements of a similar nature lies in the fact of secrecy, concealment and deception; the one applicant, though apparently antagonizing the other, is really supporting the latter's application, and the public authorities are misled by statements and representations coming from a supposed adverse but in fact friendly source. It would scarcely be doubted that two or more parties may properly unite in a partnership or corporation and thus unitedly make, in the name of the partnership or corporation, a single application for a grant or franchise; and, if they may so unite before any application, it is not easy to see why they may not so unite after having once made separate applications, providing all the facts and circumstances are fully disclosed and the public and the public authorities act upon full knowledge; and if they may sometimes so unite, an agreement for uniting is not necessarily void. As said by the New York Court of Appeals in *Atcheson* v. *Mallon*, 43 N. Y. 147, 151: " A joint proposal, the result of honest coöperation though it might prevent the rivalry of the parties, and thus lessen competition, is not an act forbidden by public policy. Joint adventures are allowed. They are public and avowed and not secret. The risk as well as the profit, is joint and openly assumed. The public may obtain at least the benefit of the joint responsibility, and of the joint ability to do the service. The public agents know, then, all that there is in the transaction, and can more justly estimate the motives of the bidders and weigh the merits of the bid."

See also *Smith* v. *Greenlee*, 2 Dev. (Law,) 126; *Phippen* v. *Stickney*, 3 Met. 384; Greenwood on Public Policy, p. 190, Rule 177.

It may be noticed that there is nothing in the agreement, reduced to writing, or as interpreted by the facts stated, which tends to show any thought or purpose of using corrupt or improper influences to secure the action of the city council. So that, upon the record as it stands, the question is, narrowly, whether any agreement to unite between parties who have applied, or contemplate application, for a franchise is under all circumstances necessarily void as against public policy.

The case is also easily distinguishable from those of contracts merely to abstain from bidding. An agreement not to bid tends to diminish the number of bidders, and thus *prima facie* to lessen the probable profitableness of the sale or contract. Yet, even in cases of public sales, the rule laid down by this court is that agreements to unite in a bidding are not necessarily void. Some other element than the mere fact of union must exist before the agreement is to be condemned. *Kearney* v. *Taylor*, 15 How. 494. In that case, at a public sale a portion of a farm was purchased by a company, organized pending the sale and making the purchase with the view of laying out and establishing a town thereon. After discussing the question of competition, and the reasons which had led courts to frequently denounce such combinations for the purpose of bidding, the opinion adds, (p. 520):

"These observations are sufficient to show that the doctrine which would prohibit associations of individuals to bid at the legal public sales of property, as preventing competition, however specious in theory, is too narrow and limited for the practical business of life, and would oftentimes lead inevitably to the evil consequences it was intended to avoid. Instead of encouraging competition, it would destroy it. And sales, in many instances, could be effected only after a sacrifice of the value, until reduced within the reach of the means of the individual bidders.

"We must, therefore, look beyond the mere fact of an as-

sociation of persons formed for the purpose of bidding at this sale, as it may be not only unobjectionable, but oftentimes meritorious, if not necessary, and examine into the object and purposes of it; and if, upon such examination, it is found that the object and purpose are, not to prevent competition, but to enable, or as an inducement to the persons composing it, to participate in the biddings, the sale should be upheld — otherwise if for the purpose of shutting out competition, and depressing the sale, so as to obtain the property at a sacrifice.

"Each case must depend upon its own circumstances; the courts are quite competent to inquire into them, and to ascertain and determine the true character of each."

The observations thus made show that every case must be determined upon its peculiar facts and circumstances, and the courts, before condemning an agreement to unite in a bid, must see that the agreement is such as really destroys the value of competitive bidding; and these observations, it must be noticed, were made in respect to a case in which a public sale had been ordered. The sale was, therefore, something which must take place, and the question of making a sale was not discretionary with the sheriff or other officer charged with the duty of making the sale. But here the city of Richmond was not bound to grant any franchise. It was free to determine whether it would grant or not, and, if it did, what form of street transportation should be adopted, and might also well consider the character, the financial ability and the situation of the various applicants in determining to whom it would be best for the public interests to grant such a franchise.

Where the grantor or vendor has not determined the question of grant or sale, and it is still a matter of discretion whether the grant or sale shall be made, it would seem that there were less cogent reasons for denouncing a combination or agreement of parties with a view of making a proposal. *Morrison* v. *Darling*, 47 Vermont, 67, 72. In that case it appeared that two parties each contemplated purchasing property belonging to a third. One of the two promised the other a certain sum if he would not interfere with him in

obtaining the property and would assist him in making the purchase. It was held that the agreement was valid. The court, after referring to the rule pertaining to the cases of public sales, said : " But in this case the owner of the share of the estate was under no obligation to sell to any one ; and there was no stipulation to resort to any illegal or improper means to mislead the owner, or to induce a sale by any fraud or artifice. We do not think such a contract can be held void as against public policy."

But, as observed, every case must depend upon its own circumstances, and it may be that when the facts in this case are disclosed by the testimony they will be found to differ materially from those stated in the bill. Inasmuch as we are of the opinion that, even if the contract be valid, the plaintiff's remedy is in a court of law rather than in a court of equity, it is not wise to attempt to definitely determine whether, under the circumstances stated, this contract was or was not void as against public policy, for such determination might prove to be, in the final result, the mere answer to a moot question. It will be more satisfactory to pass upon the question when the surrounding facts are fully developed by testimony.

We pass, therefore, to the second question, which is: Assuming this contract to be valid, was the plaintiff's remedy in equity or at law ? According to the allegations, the city council was aware of the two parties, of their agreement to unite in one application, of all the facts surrounding the agreement and proposed union, and with such knowledge it granted this public franchise to one party alone. In the exercise of its judgment in respect to the public interests, the city council determined that it was better that the defendants should have this franchise than that the united parties should have it. In the face of this determination by the authorities having special charge of the public interests, and ignorant as we must be of the reasons which controlled the city council in making this award to the one singly rather than to the two jointly, it would be improper for a court of equity to compel a consolidation of those interests. For reasons which must be held to be

sufficient and controlling, the city council deemed it not wise to grant this franchise to the two, but gave it to the one. Shall the courts overrule this determination, and entrust the franchise to the two rather than to the one? They have no general supervision over the judgment and action of public authorities. The city holds its grantee responsible for the proper discharge of the duties imposed by its grant of the franchise. It may well have determined that it did not desire the plaintiff to have any interest in it, or anything to do with the management of the street railway, and that the best interests of the city would be subserved by committing it, primarily at least, to the defendants alone. Shall the courts say that such determination was erroneous, or may be overruled simply because of a private contract between the two parties? It must be remembered that according to the allegations the city council knew of the union of interests, and yet declined to recognize such union. It may be said that by authorizing these defendants to incorporate, it put it in their power to let the plaintiff and his associates or any one else into the enterprise. Of course, the city council knew that the franchise when granted could be alienated by the grantees, and yet notwithstanding this possible alienation the fact remains that the city council determined that the primary parties to receive the franchise — the ones upon whom the burden of the contract should be laid — were the defendants alone, and not in conjunction with the plaintiff or his associates.

It is obvious that if two interests, which it may be believed are now not in harmony, if not decidedly antagonistic, are let into equal control of a franchise, such as this, the public interests may suffer. Harmony in management is no inconsiderable factor in securing the best possible results, and if the parties in interest are of two minds as to how the railway shall be managed, what improvements shall be made, and, in general, what shall be done in connection therewith, it is not difficult to perceive that their antagonism may prevent that efficiency which will tend to make the street railway of the greatest advantage to the public.

This conclusion, while not interfering with the right of the

plaintiff to maintain his action at law for the damages result-
ing from the defendants' breach of contract, at the same time
preserves the city's control over the franchise, and upholds its
determination as to the party or parties to whom it is willing
to entrust such franchise.

But beyond these relations of the public to the enterprise,
courts are not often wont to compel parties to unite interests
and work together. And here it may be well to notice that
the contract was not one in terms for a partnership in the
management of the railway, but only one for a division of
the profits. The parties stipulated to coöperate in securing
the franchise and to divide equally the profits, but left the
question of control and management unsettled. The applica-
tion, it is true, was to be in the name of the Richmond Trac-
tion Company, but who should compose that company was,
according to the last clause of the contract, to be subsequently
determined. It may, however, be conceded that there is an
implication of joint ownership as well as of joint interest in
the management, and in the profits arising therefrom, and
thus it may be said that the contract was really one for a
partnership. It is seldom that a court of equity will decree
that a partnership which has been agreed upon shall be car-
ried into effect. More frequently it is called upon to release
parties from partnership agreements on the ground that their
antagonism prevents the fulfilment of the purposes of the
partnership, and it would seem like a contradiction to force
antagonistic parties to form a partnership when it is one of
the recognized rules of equity that such antagonism is ground
for dissolving a partnership already existing. It is true that
the ordinance contemplates the formation of a corporation,
and courts will sometimes decree the specific performance of
a contract for the transfer of stock. But the ordinance was
passed after the contract, and, as we have seen, the most that
can be said of the contract is that it contemplated the creation
of a partnership. The fact that thereafter the city council
deemed it best to provide by ordinance that the grantees of
the franchise should incorporate does not change the scope of
the contract. It is precisely the same that it would have been

if the council had granted the franchise to Shield personally, and authorized him as an individual to construct and operate the railway. How then can it be said that this contract is to be deemed one for the transfer of shares of stock in a corporation? No corporation then existed. The Richmond Traction Company, in whose name the application was to be made, was not then a corporation and became one only on the passage of the ordinance. There was no certainty that one would ever be formed; there was no agreement that one should be formed, and the rights of the parties must be determined by the facts as they were at the time of the contract and the terms which entered into it. But even if it be considered as a contract specifically for the transfer of stock, what is the rule in respect to actions in case of a breach thereof? If stock has a recognized market value, courts will ordinarily leave the parties to their action at law for damages for breach of the agreement to sell, but in cases where the stock has no recognized market value, is not purchasable in the market, or has a value which is not settled, but is contingent upon the future workings of the corporation, equity will sometimes decree specific performance of a contract of purchase. It is in reliance upon this that plaintiff claims the right to a decree for specific performance. The enterprise, he says, is a new one; it is difficult to put a fair pecuniary value on the stock or on the franchise. It is one of those things contingent largely on the successful working of the railway. It must be conceded that there is force in the contention that only by letting the plaintiff into the possession of the interest he claims, can adequate compensation be secured. At the same time the present value of the franchise, and therefore of the stock of the corporation owning the franchise, is not wholly beyond estimate. That which it may have three or four years hence may depend largely upon the matter of management. But it is a franchise which has definite possibilities. The miles of track covered by it, the population adjacent to the line, and, therefore, the number of people likely to avail themselves of its advantages, the cost of construction and of operation, are all well-known facts, and upon such known facts it is not

impossible for a jury to form a fair estimate of the value of the franchise, and, therefore, of the damage which the plaintiff has sustained by the repudiation of the contract to give him a half interest in it.

The authorities generally support these views. In Pomeroy's Specific Performance of Contracts, § 290, the author, citing several cases, says: "It is well settled, as a general rule, that an agreement to enter into a partnership which would be literally performed by executing the partnership articles, or to carry on a partnership already established, will not be specifically enforced."

In *Hill* v. *Palmer*, 56 Wisconsin, 123, 129, the court observes:

"It is also well settled that the wrongful refusal by a party to a contract of copartnership to permit the firm to commence business, or, as it is sometimes termed, to *launch* the partnership business, is ground for an action at law by the injured partner to recover damages of the partner whose wrongful act has defeated the purposes for which the copartnership was formed. The cases which so hold, both in England and this country, are very numerous. Indeed, the authorities seem to be quite uniform in so holding. The following are a few of the cases referred to: *Venning* v. *Leckie*, 13 East Term R. 7; *Gale* v. *Leckie*, 2 Stark. 107; *Manning* v. *Wadsworth*, 4 Md. 59; *Glover* v. *Tuck*, 24 Wend. 153; *Bagley* v. *Smith*, 10 N. Y. 489; *Terrill* v. *Richards*, 1 Nott & McC. 20; *Ellison* v. *Chapman*, 7 Blackf. 224; *Williams* v. *Henshaw*, 11 Pick. 79; *Addams* v. *Totten*, 39 Pa. St. 447; *Vance* v. *Blair*, 18 Ohio, 532; 1 Story's Eq. Jur. sec. 665; Collyer on Part. sec. 245; 2 Lindley on part. (4th ed.) 1025, and cases cited in notes."

*Powell* v. *Maguire*, 43 California, 11, disclosed, like the case at bar, an agreement in respect to a franchise to be obtained from the legislature for the mutual benefit of plaintiff and defendant. The franchise in that case was for maintaining a steam ferry, and it appeared that the defendant, after obtaining the franchise in his own name, constructed a ferryboat at his own expense, and operated it between the points named in the charter. The suit was one to obtain

specific performance of the agreement, and it was held that it could not be maintained, the court saying, on page 19:

" Upon these facts it is obvious that if the plaintiff's rights rested solely on a verbal agreement, to the effect that he and the defendant would establish and maintain the ferry at their joint expense, and for their joint benefit, without reference to the franchise, the plaintiff's only remedy would be an action at law for a breach of contract. He would have no right to participate in the profits of an enterprise to which he had contributed nothing, and could claim no interest in a boat constructed by the defendant, at his own expense, and for his own use, nor in the earnings thereof. In such cases it is well settled that, when the partnership was never launched, and when one of the copartners has proceeded to conduct the enterprise in his own name, at his own cost, and for his own exclusive benefit, excluding the other party therefrom, and repudiating the partnership agreement, the only remedy of the injured party is an action at law for a breach of contract. There would be in such a case, no existing partnership, but only an agreement to form one, which was never consummated by launching the enterprise."

In that case, also, it was held that the contract was against public policy, the facts in respect to the contract not having been disclosed to the legislature at the time the franchise was granted. In respect to this it was said (p. 21):

" When the legislature grants a franchise to a particular person, his associates and assigns, it delegates to him the right to select the person thereafter to be associated with him in the enterprise. . . . But if several persons desiring to obtain a franchise from the legislature, in which they are all to be mutually interested, see fit to ask it in the name of one only, public policy requires that they should be made to rely solely on his good faith in carrying out the agreement; and if he repudiates the contract on obtaining the franchise a court of equity will grant no relief. It may be that, if the legislature had known beforehand who the real parties in interest were, they would not have made the grant; and if the courts could be appealed to, to enforce such secret ante-

cedent agreements, unsupported by any subsequent acts of the ostensible beneficiary, it is evident that powerful secret combinations would be formed to procure vicious legislation under false pretences."

These authorities might be multiplied, but they are sufficient to show the general rule controlling actions of this kind. For these reasons and upon these authorities we are of the opinion that the suit for specific performance cannot be maintained.

*The decree of the Circuit Court was one dismissing the bill absolutely. In view of the doubt which rests as to the validity of the contract we think it should have been a dismissal without prejudice, and the order will be, therefore, that the case be remanded to the Circuit Court with directions to modify the decree so as to make it one dismissing the bill without prejudice to an action at law.*

MR. JUSTICE HARLAN, concurring.

I am of opinion that the object as well as the effect of the contract set out in the bill was to diminish competition in reference to the obtaining of a public franchise. For that reason it was detrimental to the public interests, and one in respect of which a court of equity ought not to give any aid to either party. In addition to this view, it appears upon the face of the ordinance in question that the city council of Richmond named the persons by whom that franchise was to be exercised; and a court of equity ought not to force another party into connection with those whom the city council thus designated. Aside from these considerations, I am of opinion that if the plaintiff has any remedy at all, he has an adequate one at law. Upon this last ground I acquiesce in the judgment of the majority of the court in this case.

MR. JUSTICE BROWN, with whom concurred MR. JUSTICE PECKHAM, dissenting.

MR. JUSTICE PECKHAM and myself are unable to concur in that part of the opinion of the court which holds that the

complainant is not entitled to relief in equity. Neither the agreement between Hyer and Shield of August 9, 1895, nor the negotiations of these parties with the common council of the city of Richmond, contemplated or implied a partnership between them. Not only is it a fact of which we may take notice that street railways are universally constructed and operated by corporations, but it was one of the stipulations of the agreement of August 9, 1895, that "the application and franchise to be presented to the common council of the city of Richmond" should "be that of the Richmond Traction Company for the building of an overhead trolley or cable railway system." The franchise of June 17, 1895, was granted by an ordinance of this council to Hyer and his associates under the corporate name of the "Richmond Conduit Railway Company," while the rival competing scheme of Shield was applied for under the name and style of the "Richmond Traction Company." Not only must the common council have understood that it was contracting with a corporation, but there is nothing to show that it placed any special reliance upon the personal qualities of Shield or his associates. Indeed, the facts set forth in the bill in this connection show conclusively there could have been no such reliance.

While the entire stock of the Richmond Traction Company may have been taken in their names, there was nothing to prevent that stock from being transferred at any time to other parties; nor could the city have had any personal claim against Shield or his associates. The transaction was with the corporation, and with the corporation alone, and in a legal point of view it was a matter of entire indifference to the city who became the owners of the stock. The entire stock of the company might have been transferred to other parties the day after the charter was granted without any violation of its provisions. In fact, the common council is alleged to have understood that the interests of the two companies had been consolidated, and granted the charter to the Traction Company, with knowledge that Hyer and his associates were to participate equally in the enterprise.

Under such circumstances, we think it clear that the court

should have entertained a bill for the specific performance of this contract, and not have relegated the parties to the doubtful and unsatisfactory remedy of an action at law. We understand the rule to be, as stated by Cook on Stock and Stockholders, section 338, that "if the stock contracted to be sold is easily obtained in the market, and there are no particular reasons why the vendee should have the particular stock contracted for, he is left to his action for damages. But where the value of the stock is not easily ascertainable, or the stock is not to be obtained readily elsewhere, or there is some particular and reasonable cause for the vendee's requiring the stock contracted to be delivered, a court of equity will decree a specific performance, and compel the vendor to deliver the stock."

This principle is particularly applicable to a case of this kind, where the corporation was but recently formed, the railroad yet unconstructed, and its shares of uncertain value — if indeed they had any market value at all. To require the complainant, under these circumstances, to bring a personal action for a breach of contract against Shield, who is alleged to be hopelessly insolvent and wholly unable to respond in damages, is to offer him the shadow and deny him the substance of relief.