## WRIGHT v. AMANN.

(Circuit Court, D. Nevada. May 21, 1910.)

No. 1,005.

1. PARTNERSHIP (§ 47*)—AGREEMENT—CONSTRUCTION.
    In case of doubt as to the existence of a partnership in a suit for an accounting, the court may look to the conduct of the parties at the time of and subsequent to the date of the contract to ascertain what they understood and agreed on.
    [Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 68–72; Dec. Dig. § 47.*]

2. PARTNERSHIP (§ 53*)—CREATION—ACCOUNTING.
    Evidence held to require a finding that a contemplated partnership between plaintiff and defendant was never actually launched, but that defendant proceeded to conduct the enterprise in his own name for his exclusive benefit, and hence plaintiff could not maintain a suit for an accounting, but only an action at law for breach of the agreement to form a partnership.
    [Ed. Note.—For other cases, see Partnership, Cent. Dig. § 76; Dec. Dig. § 53.*]

In Equity. Suit by James M. Wright against E. J. Amann for dissolution and settlement of a partnership. Dismissed.

Charles C. Butler, for complainant.
Charles C. Stanley, for respondent.

FARRINGTON, District Judge. This suit was brought for a dissolution and settlement of a copartnership. The bill alleges, in substance, that complainant and respondent entered into a copartnership September 2, 1904, by the terms of which complainant was to contribute $150 to Amann to be used in purchasing transportation for himself from Colorado to Goldfield, Nev., and for his support and maintenance while there. He was also to contribute to the partnership from time to time, upon Amann's request, such further sums as might be necessary for the latter's support, until the receipts of the partnership were sufficient for his maintenance. On his part, the said Amann was to contribute and devote to the partnership his time,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

labor, and skill in the business of mining brokerage, stock brokerage, real estate brokerage and agency, mining promotion, mining, and any enterprise and employment in the state of Nevada he might deem profitable. He was to conduct said enterprise in his own name, and out of the profits he was to be allowed $5 per day for every day except Sundays, during the continuance of the partnership, and the remaining profits were to be divided equally between Wright and Amann.

It is further alleged that complainant has performed all the conditions of the partnership agreement on his part to be performed; that Amann with the $150 partnership funds, went to Goldfield, where he engaged in various kinds of business, contemplated by the agreement; that the profits in such business made by Amann and now held by him, amount to more than $200,000; that Amann now denies and repudiates said copartnership, and that he refuses to make any statement or accounting of said partnership business, although he has heretofore been requested so to do. In his answer Amann denies the existence of any partnership or partnership agreement; admits that he received $150 from Wright, with which he purchased transportation to Goldfield; but denies that it was received in pursuance of any partnership agreement, or that any of it was used in acquiring property in Nevada, or elsewhere. He also denies that he has ever received any money from Mr. Wright, other than the $150. Witnesses examined on behalf of the parties afford little or no corroboration to the testimony of either. No witness was present when the agreement was made. Mr. Wright says that he intended to draw up an ironclad contract with Mr. Amann, but after being advised by his friend Mr. Shepherd "that it would be poor business to draw up such a contract, * * * and that it would be, in his opinion, a good idea to have a verbal agreement for various reasons," he concluded that a written agreement was unnecessary, and none was executed.

September 2, 1904, Amann received the $150. Thirteen days later he was in Goldfield writing a long letter to complainant. He discusses the general conditions of the camp, says there is nothing to be located within 16 miles north or south, and perhaps the same distance east or west; money is the only thing that talks, and it is impossible to get longer than a 30-day option on mining claims, and then part must be paid down in cash. He thinks he will be able to relocate a claim or two. He speaks of one group of claims which he can get for $4,500, and another for $6,000, in each case $1,000 must be paid down, and the balance in 30 days, either of which "is an excellent scheme, and the stock can easily be sold here or elsewhere." The second proposition will form two companies, and could be made to pay big as a stock deal. He then writes:

"You ought to think this matter over and see if you, yourself, or Shepherd and another can't get some money together for one of these schemes and let me know at once—in fact, immediately."

He then speaks of another group of claims which can be secured for $1,500, on which the assessment work will cost $200, and incorporation, $100. He also says that Cripple Creek people in Goldfield

are offering to buy stock in any scheme he may promote, and that Shepherd said he would put in with Wright in anything Amann might find, and finally he says, "We have got to get in, but you will find I am all right."

Mr. Amann says that, between September 15th and 18th, he located three claims, and then wrote his second and final letter to Mr. Wright. This letter was not introduced in evidence, and but two persons, Mr. Wright and Mr. Amann, testify as to its contents. Amann testifies that in this letter he told Wright the amount of money he had left after paying expenses to Goldfield, and of the options he had gotten, and asked Wright to take them up. He also wrote that he had located three claims, that they could be incorporated and stock sold, and urged Wright to send money to do the location work and for incorporating; and finally suggested that it would be better to do the work on the locations than to take up the options. Mr. Wright admits the receipt of a second letter, but says that it dwelt principally on a $7,500 option, and directed him to wire that amount to Amann; that he never was notified that Amann had located any claims; that no demand was ever made on him for any money, except the $7,500; and that Amann did not tell him how much money he had left after paying his expenses to Goldfield. Wright testifies that he replied to this letter, asking Amann to secure a reasonable extension on the option so that he might go to Goldfield, and that he inclosed in the envelope two $50 bills. This letter was never returned. Amann swears that he never received the letter or its contents. In December, 1904, Mr. Wright wrote his last letter, in which he asked Amann "if he had dropped from the earth, and why he did not write." Mr. Amann testifies that, in consideration of the $150 and Wright's promise to send him $75 the first of each month, he was to do absolutely nothing but locate claims; that Wright was to have a half interest in every claim so located, and was also to send funds for the location work, recording, etc.

In his first deposition Mr. Wright says that Amann was to do anything he could to make money in a legitimate way; that he was to furnish Amann his living and necessary expenses until he got on a paying basis in any kind of business, and, when he got on a paying basis, Amann was to deduct his expenses and $5 per day, and divide up the balance. "He agreed to divide up equally anything he got." Amann "was to go into any kind of business he could make any money out of." In response to this question, "Were you to have an option to go into any mining scheme with him if you chose?" Mr. Wright replied:

"I was to have an option to go into anything before I went into it. Q. Any mining scheme? A. Yes. * * * The agreement did not mention any specific kind of business, it was a broad kind of an agreement, taking in any branch of business, but there was nothing definite decided upon."

In his second deposition Mr. Wright testifies that Amann "was to find a location for a mining, brokerage and real estate business. * * * It was agreed that if Amann found a fraction or a good mining claim, and could locate, he was to submit it to Wright for in-

vestigation, and, if it appeared valuable, Wright was to secure, or assist in securing, title." Mr. Wright also testifies as follows:

"You say the only agreement you had with Mr. Amann to remit to him money was that you were to remit him money when he asked for it? A. Yes. And if he could not find anything out there I was to send him money to come back with. Q. Your understanding of the agreement was that you were to have the option of going into claims or other business, as well as the brokerage business? A. I did not pin myself in that agreement to put up a specific amount of money for any particular purpose; it was optional with me whether I invested heavily or not, aside from paying his necessary expenses. I did obligate myself for that. Outside of that I did not obligate myself to put up any specific amount of money."

The date when Mr. Amann engaged in the business in which he accumulated the money mentioned in the complaint is not given. Mr. Wright admits that he learned some time later that Amann was making money, but it does not appear that he ever asserted any claim to any interest in Amann's business until about the time suit was brought, September 4, 1907.

It does not seem to me that complainant has established either the partnership agreement or the existence of a partnership, by that preponderance of evidence which the law requires. It is clear there was some agreement, but the statement of each party as to what the terms of the agreement were, stands practically alone, uncorroborated and unsupported.

[1] It is a familiar principle that in cases of doubt, we may look to the conduct of the parties at the time of and subsequent to the date of the contract, in order to ascertain what they understood was agreed upon. But such a scrutiny here is fruitless.

[2] Five letters passed between Wright and Amann within four months after the contract. Only two of these letters are in evidence, and the oral testimony as to the material contents of the other three is in hopeless conflict. In the two letters in evidence, there is much said about securing options and purchasing mining property; little is said of locating claims, and nothing about brokerage business; nothing of sending $75 to Mr. Amann the first of each month; and nothing about any request from Amann for such money as he may need for expenses. Mr. Amann says he located three claims, but whether he advised Mr. Wright of that fact or not, there is nothing in the evidence which indicates that the mines were of any value whatever. Although Mr. Amann owned a half interest in each of these so-called claims, he never did the discovery work, and there is no showing that the locations were ever recorded. Probably Mr. Amann received $150, for which he has never rendered an equivalent. This might support an action at law, but until the actual existence of a partnership is established clearly by the evidence, there can be no suit in equity for dissolution.

If complainant's testimony be assumed to be true, and his version of the transaction correct, we have a contract under which he furnishes Mr. Amann $150 to go to Goldfield to look into prevailing business conditions, and to open a brokerage business. Wright is to furnish money to meet expenses, until the business is on a paying basis.

When such basis is reached, Amann is to deduct his expenses and $5 per day, and divide the balance equally between himself and Wright. If Amann fails to find a favorable opening, Wright is to send him money to pay his expenses back to Colorado. 'Mr. Wright advanced the $150 with which Amann went to Goldfield several months later. Arriving at that city, Amann engaged in business in which he accumulated a large sum of money, but he always refused to recognize Mr. Wright as a partner, and denied any partnership agreement.

Wright says, "I was to have an option to go into anything before I went into it," and "it was optional with me whether I invested heavily or not aside from paying his necessary expenses." These statements are hardly consistent with the theory that a partnership agreement, definite and final, was ever entered into. If it be conceded that the agreement constitutes a copartnership, still there is no evidence that the enterprise in which Amann accumulated the $200,000 was ever entered upon as a partnership. There is no evidence that the business was acquired with any money advanced by Wright, or that Wright ever participated in its management. While Mr. Amann was expending the money advanced by Mr. Wright, he was not actually engaged in the copartnership business contemplated by the contract. He was merely searching for such a business. If he found nothing, Wright was to furnish money for his return to Colorado. In that event, it could not be contended that any partnership business had ever been commenced or established. On the other hand, if Amann found something good, it was optional with Wright whether he would invest much, little, or nothing. The execution of the agreement was thus contingent upon Amann's finding a good opening for business, and also upon Wright's approval. When the business was found and Wright was not included as a copartner; when Amann failed to report, and failed to demand expense money, and finally refused to recognize Wright as a partner—there was a breach of the original contract, a failure to consummate the agreement. The proper and exclusive remedy for such a wrong is an action at law, and not a suit in equity for dissolution of the partnership.

In Powell v. Maguire, 43 Cal. 11, there was a verbal agreement to procure a franchise in the name of Maguire to run a ferry between Vallejo and Mare Island; each party was to be equally interested in the business and franchise. After procuring the franchise, Maguire proceeded to conduct the business in his own name at his own cost, and for his own exclusive benefit. He repudiated the agreement, excluded Powell, and refused to recognize any interest in him.

"In such cases," said the court, "it is well settled that when the partnership was never launched, and when one of the copartners has proceeded to conduct the enterprise in his own name, at his own cost, and for his own exclusive benefit, excluding the other party therefrom, and repudiating the partnership agreement, the only remedy of the injured party is an action at law for a breach of contract. There would be, in such a case, no existing partnership, but only an agreement to form one, which was never consummated by launching the enterprise."

In Hill v. Palmer, 56 Wis. 123, 14 N. W. 20, 43 Am. Rep. 703, there was a partnership agreement for the purpose of cutting timber

belonging to a man named Cline. It was understood that Palmer was to contract in his own name with Cline for the work; that the work was to be done jointly; the expenses, and gain or loss, were to be shared equally by plaintiff and defendant. Plaintiff gave defendant valuable information concerning the work. The defendant secured the contract in his own name, but refused to permit plaintiff to have any part in the work or in the business. The court held that while a partnership may have commenced when the agreement was made, yet no business was transacted, nothing was done by the partners as partners, and, by refusing to permit the plaintiff to participate in the contract, defendant refused to launch the copartnership, therefore an action at law for damages was the proper remedy. This case is quoted with approval by Justice Brewer in Hyer v. Richmond Traction Co., 168 U. S. 471, 478, 18 Sup. Ct. 114 (42 L. Ed. 547).

"An action at law lies for damages for breach of a contract to form a partnership or enter into a firm, or to admit, or procure the admittance of, the plaintiff into a firm; for in such case partnership accounts have not been created or business transacted. And the same rule would apply if there is an actual partnership in præsenti formed, but the defendant refuses to permit the business to be launched, and excludes the plaintiff from participation from the beginning, so that no joint business has been transacted." 2 Bates on Partnership, § 870; Vance v. Blair, 18 Ohio, 532, 51 Am. Dec. 467; Prince v. Lamb, 128 Cal. 120. 60 Pac. 689; Goldsmith v. Sachs (C. C.) 17 Fed. 726; Meagher v. Reed, 14 Colo. 335, 24 Pac. 681, 9 L. R. A. 455, 460; Mann v. Bowen, 85 Ga. 618, 11 S. E. 862.

I am of the opinion that no partnership business was ever actually launched, and that plaintiff cannot recover in a suit in equity for a dissolution and an accounting.

The suit will be dismissed, but without prejudice to an action at law.