512 So.2d 14 (1986)
McMILLAN, LTD., an Alabama Limited Partnership, et al.
v.
WARRIOR DRILLING AND ENGINEERING COMPANY, INC., and Howell Petroleum Corporation.
No. 84-1109.
Supreme Court of Alabama.
October 31, 1986.
On Rehearing May 15, 1987.
Rehearing Denied July 24, 1987.
*15 Alton B. Parker, Jr. and J. Mark Hart of Spain, Gillon, Riley, Tate & Etheredge, Birmingham, for appellants.
James A. Harris, Jr., Kaye K. Houser, and Charles R. Driggars of Sirote, Permutt, Friend, Friedman, Held & Apolinsky, P.C., Birmingham, for appellees.
BEATTY, Justice.
This is an appeal by plaintiffs, McMillan, Ltd., and its managing general partners, individually (hereinafter referred to collectively as "McMillan"), from a summary judgment entered in favor of the defendants, Warrior Drilling and Engineering Company, Inc. (hereinafter "Warrior") and Howell Petroleum Corporation (hereinafter "Howell") in plaintiffs' suit seeking, among other things, specific performance of an option to purchase stock. We reverse and remand.

I.
Warrior is an Alabama corporation with its principal place of business in Tuscaloosa. At the time of its incorporation in 1971, Warrior had a total of seven stockholders with 100,000 shares of common capital stock authorized. William E. Tucker, Warrior's founder and principal incorporator, received 40,000 shares of Warrior stock in consideration for his work for the company during its first year of operation. The other six stockholders paid $1.00 per share for varying portions of the remaining 60,000 shares.
McMillan is an Alabama limited partnership with its principal place of business in Brewton, Alabama. At all times pertinent to this lawsuit, Robert C. McMillan and Albert C. Tate, Jr. (now deceased), were the managing general partners of McMillan.
In 1974, Warrior declared a ten-for-one stock split, which resulted in there being one million Warrior shares issued, with another million shares authorized to be sold by the corporation. Of these latter authorized *16 shares, 37,000 shares were given to a consultant in exchange for work performed for Warrior. None of the remaining authorized shares were ever sold.
In late 1979, Warrior began to experience financial difficulties. At the suggestion of the First National Bank of Birmingham (Warrior's principal creditor, which held Warrior notes totaling $32 million), Warrior entered into an agreement with the Holly Corporation, a Texas corporation, with respect to Holly Corporation's acquisition of Warrior's assets. In connection with this transaction, the members of Warrior's board of directors (including Tucker) entered into a stock option agreement with Holly Corporation on February 15, 1980.
In late March or early April of 1980, Tucker learned that Holly Corporation was attempting to acquire 125,000 shares of Warrior stock from a group of investors in Montgomery, Alabama, who held the stock in the name of Investment Capital Corporation. The price offered by Holly Corporation was $2.25 per share. Tucker attempted to arrange financing to purchase these shares himself. Unable to do so in time, Tucker had checks totaling $300,000 issued on the Warrior checking account to purchase in his own name the 125,000 shares from Investment Capital Corporation. When this transaction was discovered, Tucker was fired from his position as president and removed as chairman of Warrior's board of directors.[1]
In order to repay Warrior for the $300,000 he had "borrowed" from the company to purchase this stock, Tucker borrowed $100,000 from each of three different sources, one of which was McMillan. McMillan agreed to make the loan on the basis of Tucker's pledging 44,445 shares of Warrior stock as collateral for the loan and in consideration for an option to purchase up to 10 percent of the outstanding voting common stock of Warrior at a price of $2.25 per share, the option to run for one year. The parties entered into a written agreement to this effect on April 11, 1980, entitled "SECURITY AGREEMENT & OPTION TO PURCHASE." The agreement provided in pertinent part as follows:
"This agreement made and entered into April 11, 1980 between William E. Tucker, 1413 7th Court N.E., Tuscaloosa, Alabama 35401, hereafter called the Pledgor, and McMillan Ltd. an Alabama Limited Partnership, Leigh Pl., Brewton, Alabama 36427, hereafter called Pledgee.
"WHEREAS, at the time of the execution of this agreement the Pledgee has loaned the Pledgor the sum of 100M evidenced by promissory note for such amount, and
"WHEREAS, to induce the pledgee to make such loan, the Pledgor has agreed to pledge certain common stock in Warrior Drilling & Engineering Co., Inc., an Alabama Corporation hereafter called Warrior, with Pledgee, as security for repayment of such loan, and further to offer Pledgee the option to purchase stock owned by Pledgor in Warrior:
"It is therefore agreed:
"1. In consideration of sum of 100M loan to Pledgor by Pledgee, receipt of which is hereby acknowledged, the Pledgor grants a security interest to Pledgee in 44,445 shares of voting common stock of Warrior, an Alabama Corporation. It is recognized between parties that Pledgor is owner of said stock by virtue of a recent acquisition but Pledgor is not presently in physical possession of stock certificates.
"Pledgor agrees that upon obtaining physical possession of Certificate properly registered in his name, that he will fully endorse in blank and immediately deliver to Pledgee certificates representing a minimum of 44,445 shares of common stock of Warrior.
"Upon delivery of the stock, Pledgor hereby appoints the Pledgee as Attorney to arrange for the transfer of pledged shares on the books of Warrior to the name of the Pledgee.
"2. Option to purchase stock as further consideration for making this loan. Pledgor does grant unto Pledgee the option *17 to purchase up to ten percent of the outstanding voting common stock of Warrior at a net price to Pledgee of $2.25 per share, with said option to remain in existence for a period of one year from the date of the execution of this instrument. Pledgor represents that either he individually or in conjunction with third parties owns and/or controls sufficient shares of Warrior necessary to fulfill the terms of this paragraph."
The parties also executed a written assignment of the pledged stock in favor of McMillan, and Stock Certificate No. 225 in the amount of 44,445 shares was delivered to McMillan by Tucker as security for the loan.
On April 16, 1980, Warrior filed a bankruptcy petition, seeking the protection of the court under Chapter 11 of the Bankruptcy Act. Tucker filed a personal Chapter 11 proceeding that same day. The First National Bank of Birmingham objected to the bankruptcy proceedings and attempted to force Warrior into an asset liquidation. Warrior resisted by attempting to put together a "Plan of Reorganization" which would be acceptable to the bankruptcy court. The deadline for filing this plan was September 5, 1980.
In July of 1980, Howell became interested in Warrior as a possible acquisition. Howell is a Delaware corporation with its principal place of business located in Houston, Texas. Howell conducted an acquisition study, including several visits to Warrior's offices, with Howell's acquisition team spending two weeks in Alabama studying the proposal. On August 25, 1980, Howell delivered to Tucker a written offer to purchase all of the outstanding stock of Warrior. By letter dated August 26, 1980, Tucker informed Howell of the outstanding Holly Corporation option, which expired on August 31, 1980. No mention was made in this letter of the McMillan option; Tucker, nevertheless, insists that he also informed Howell of the McMillan option, although not in writing. Indeed, Tucker testified that Paul Howell, chairman of the board of Howell; Darby Sere, acquisitions vice president; and Sidney F. Jones, Jr., president, all read everything in the file on McMillan, including the security agreement and the option. Tucker testified that Sere asked specific questions regarding the likelihood of McMillan's exercise of its option and the possibility of McMillan's subsequent refusal to sell to Howell. Howell denies that it was so informed as early as September 5, 1980.
On September 5, 1980, Tucker and other shareholders (whose combined stock ownership totalled approximately 80 percent of Warrior' stock) accepted Howell's offer and entered into an agreement with Howell. That agreement provided that Howell would purchase all of Warrior's stock at $3.57 per share, of which one-half of the purchase price would be paid to the tendering shareholders at a closing scheduled for December 2, 1980, and the other half placed in escrow to be paid at a later date subject to certain setoffs. That agreement further provided:
"On the closing date [Howell] will acquire from each Shareholder signing this agreement and each such Shareholder represents to [Howell] that [Howell] will acquire all of the [Warrior] stock owned by such Shareholder free and clear of all liens, claims, options or other encumbrances." (Emphasis added.)
Tucker sent a copy of this agreement to McMillan prior to October 1, 1980.
In early October, Tucker petitioned to dismiss his personal bankruptcy proceeding. Richard S. Riley, an attorney representing McMillan, appeared at the hearing on Tucker's motion to dismiss, and announced that McMillan had an option to purchase Tucker's shares in Warrior and expected it, as well as its note, to be satisfied. Howell objected to the dismissal of Tucker's personal bankruptcy, and was represented by counsel at the hearing on Tucker's motion. Tucker testified that counsel for Howell was present at the time of Riley's remarks.
By letter dated October 20, 1980, and addressed to Sidney F. Jones, Jr., president of Howell, Riley informed Howell of McMillan's option and took the position that any shares Howell purchased from Tucker *18 would be subject to the option. That letter is set out in its entirety below:
 "October 20, 1980
 "HOWELL PETROLEUM CORPORATION
 711 Polk Street, Suite 1200
 Houston, Texas 77002
 "Attn: Mr. Sidney F. Jones, Jr.
 "Re: Warrior Drilling &
 Engineering Co., Inc.
"Gentlemen:
"This firm represents McMillan, Ltd., an Alabama limited partnership.
"We take this opportunity to inform you that McMillan, Ltd. holds an option given by William E. Tucker on April 11, 1980 to purchase up to 10% of the outstanding common stock of Warrior Drilling & Engineering Co., Inc. In the option Mr. Tucker represented that he individually, or in conjunction with others, owns and/or controls sufficient shares of Warrior necessary to fulfill the terms of this option.
"We note that in Howell's offer to shareholders of Warrior dated September 5, 1980 Howell proposed to the stockholders that it would acquire all of the issued and outstanding stock of Warrior at $3.57 per share subject to the terms and conditions set forth in said offer.
"We presume that William E. Tucker has accepted Howell's offer. We, therefore, wish to inform you of the outstanding option held by McMillan, Ltd. to purchase up to 10% of Warrior's common stock and that such option predates any agreement by Mr. Tucker to sell you his shares, so that any stock which you purchase from Mr. Tucker is subject to the outstanding option.
"McMillan's option expires April 11, 1981.
 "Very truly yours,
 "SPAIN, GILLON, RILEY,
 TATE & ETHEREDGE
 "/s/Richard S. Riley
 "Richard S. Riley"
Howell contends that receipt of this letter was Howell's first notification of the option held by McMillan. Copies of the letter were sent to Darby Sere and Louise Glenn, general counsel for Howell. The next day, Howell requested a copy of the option from Riley.
Sere discussed the option with Louise Glenn, who, according to Sere's testimony, felt "that in return for paying off the loan, the option would be terminated.... So I didn't worry about it any more." Sere further testified that "[a]s acquisitions vice-president, I didn't take anything away from Bill Tucker to cover this option value or anything."
On November 21, 1980, Riley wrote a letter to Tucker's attorney, Martin Ray, setting out the terms of Tucker's payoff of the loan by McMillan so that the pledged shares could be released to Tucker for transfer to Howell at the December 2 closing. In the letter, Riley stated: "McMillan, Ltd., contends that its option to purchase up to 10% of the outstanding voting common stock of Warrior Drilling & Engineering Co., Inc., survives payment of the above note." Tucker testified that he gave Louise Glenn a copy of this letter prior to December 2, and that she read it in his presence.
The closing was held on December 2, 1980, as scheduled, and Howell acquired 98% of the outstanding Warrior stock. Howell issued to McMillan and/or Tucker a check for the amount of Tucker's debt plus interest. In turn, McMillan reassigned and surrendered the collateral stock to Tucker, who simultaneously transferred it to Howell. According to the testimony of Riley and Tucker, at the closing Riley again told Louise Glenn that it was McMillan's position that the option survived the closing. However, Louise Glenn testified that she had no recollection of that statement by Riley.
Some four months later, on Friday, April 10, 1981, McMillan purported to exercise its option to purchase 10 percent of Warrior's stock. It is undisputed that Albert Tate, a general partner of McMillan, telephoned Darby Sere at Howell that afternoon around 5:30 p.m. (CST) concerning the option. Tate testified that he exercised the option by that telephone call to Sere.
*19 Tate's notes on the conversation indicated that he told Sere the purchase price (of $2.25 per share for 100,000 shares) would be delivered wherever Sere "wanted it delivered against receipt of the shares duly authorized for transfer." It is also undisputed that, during Tate's conversation with Sere, Sere received another telephone call from Western Union, who read over the telephone the contents of a mailgram sent by Tate to Sere. This same mailgram was also sent to Howell, Warrior, and Tucker. Written confirmation copies of the telephone message were also sent. The message read as follows:
"McMillan, Ltd., hereby exercises as to 100,000 shares of the voting common stock of Warrior Drilling and Engineering Co., Inc., the option granted to it April 11, 1980, by William E. Tucker to purchase said shares at a price of $2.25 per share. These are shares which we understand you purchased from Mr. Tucker following notice to you of the existence of such option. We have advised Mr. Tucker and Warrior Drilling and Engineering Co., Inc., of our exercise of this option. The option price will be delivered at such place and time as you shall designate against receipt of a certificate representing said shares duly endorsed for transfer to the undersigned.
"McMillan, Ltd., by Albert C. Tate, Jr., Managing General Partner...."
Howell's written confirmation copy was stamped "received" Monday, April 13, 1980, although Sere testified that it would have been so stamped even if it had been actually delivered to Howell after regular business hours on Friday, April 10, or on Saturday, April 11, or Sunday, April 12. Howell refused to acknowledge McMillan's purported exercise of its option, thereby refusing to tender any shares to McMillan. This lawsuit followed.
On May 31, 1981, McMillan filed its complaint against Howell and Warrior, seeking to enjoin them from effecting a reverse stock-split recapitalization plan with respect to Warrior and its capital stock and further to enjoin the defendants from denying McMillan's ownership interest in 100,000 shares of Warrior stock. McMillan further sought, in essence, to compel Howell and Warrior to deliver the Warrior stock to McMillan upon its payment of the price specified in the option agreement between McMillan and Tucker. McMillan also claimed damages arising from Howell's failure to sell the Warrior stock, failure to recognize McMillan as the owner of it, and from Howell and Warrior's recapitalization efforts, characterized by McMillan as a freeze-out of McMillan's stock interest and a breach of the majority stockholder's fiduciary duty to the minority stockholders. McMillan further claimed that the alleged freeze-out scheme constituted conversion, fraud, and deceit as to McMillan.
By their answer, Howell and Warrior denied McMillan had any legal or equitable claim to the Warrior stock, and pleaded the following as affirmative defenses: that the Statute of Frauds barred McMillan's claim; that Howell was a bona fide purchaser of Tucker's stock; that the equity court lacked jurisdiction in that there was an adequate remedy at law; that McMillan was estopped from claiming any interest in the Warrior stock; that McMillan had waived its claim to the stock; and that McMillan had failed to timely and properly exercise its option.
By agreement of counsel, the trial court entered an order on August 13, 1981, staying all discovery as to McMillan's claim regarding an alleged freeze-out, pending a determination by the court as to McMillan's interest in the Warrior stock. This order limited discovery to the issue of whether McMillan could require Howell to sell to McMillan the 100,000 shares of Warrior stock it sought to purchase pursuant to the option agreement between Tucker and McMillan. The parties subsequently engaged in extensive discovery on this issue.
On April 12, 1983, McMillan filed a motion for partial summary judgment with respect to issues relating to Howell's purchase of Tucker's stock subject to McMillan's option, and to McMillan's proper exercise of that option. McMillan claimed that, based on the pleadings, documents produced, interrogatories, and depositions, together with all exhibits attached to those depositions, *20 there was no genuine issue of material fact, and that McMillan was entitled to judgment as a matter of law. On June 1, 1983, Howell and Warrior amended their answer to further plead acquiescence and unclean hands, and to allege that McMillan's option did not constitute an "adverse claim" as defined in Code of 1975, § 7-8-301. Howell and Warrior also filed their own motions for summary judgment.
On January 16, 1985, the trial court entered a final judgment in favor of Howell and Warrior with respect to all of McMillan's claims on the basis that McMillan had failed to timely and effectively exercise its option. Specifically, the trial court found that McMillan was required to purchase the stock within one year from the date of the option, as opposed to giving timely notice of the exercise of its option.
On February 15, 1985, McMillan filed post-judgment motions pursuant to Rules 52(b) and 59(a) and (e), A.R.Civ.P. On March 21, 1985, the death of Albert C. Tate, Jr., was suggested on the record. However, a Rule 25(a) motion for substitution was never filed in the trial court.
By express consent of the parties, the time for the trial court to rule on McMillan's post-judgment motions was extended. See Rule 59.1, A.R.Civ.P. At the specific request of all parties to this case, the trial court amended its final order on July 9, 1985, to address the additional issues raised by each party's respective summary judgment motion. In its amended order, the trial court extended its earlier order and found in favor of McMillan with respect to all of the remaining defenses raised by Howell and Warrior. Specifically, the trial court found that (1) the Statute of Frauds defense was without merit; (2) the unexercised option was an "interest in the security" within the meaning of "adverse claim" under § 7-8-301, supra; and (3) because Howell took delivery of Tucker's stock with notice of the unexercised option, it was not a bona fide purchaser, and it, therefore, acquired only those rights in the securities that Tucker had. The trial court concluded its amended order with the following:
"Accordingly, the Court therefore holds that should McMillan be held to have validly and timely exercised its option and, further, that McMillan is not barred by estoppel or laches of its right to exercise it, the Uniform Commercial Code defenses of Howell present no defense to McMillan's claim. The Court, therefore, rules that Tucker's defenses presented by summary judgment and not ruled upon by the Court in the final judgment entered here, are denied."
On July 17, 1985, McMillan filed its notice of appeal from this amended final order. No cross-appeal was filed by Howell or Warrior.

II.
At the outset, we must decide the propriety of a motion for substitution filed in this Court on February 3, 1986, by the executrix of the estate of Albert C. Tate, Jr. This motion is purportedly made pursuant to Rule 43(a), A.R.A.P., which provides:
"(a) Death of a Party. When the death of a party has been suggested, the proceeding shall not abate, but shall continue or be disposed of as the appellate court may direct."
It is undisputed that a motion for substitution under Rule 25(a), A.R.Civ.P., was not filed in the trial court prior to the filing of this appeal. Under the terms of Rule 25(a), "unless a motion for substitution is [properly] made not later than six months after the death is suggested upon the record ... the action shall be dismissed as to the deceased party."
The executrix, Elvira M. Tate, contends that Rule 43, A.R.A.P., permits her substitution now because the notice of appeal filed by counsel for Albert Tate was filed prior to the expiration of the six-month period provided in Rule 25, A.R.Civ.P. The executrix further contends that, since there is no time limit for substitution of parties under Rule 43, her motion in this Court is not barred by the fact that it was not filed until almost ten months after the death of Albert Tate was suggested on the record.
In their motion in opposition, defendants correctly point out that appellate *21 Rule 43 applies to substitution when the death of a party occurs during the pendency of an appeal. See Killough v. Killough, 373 So.2d 336 (Ala.Civ.App.1979). Because Albert Tate's death occurred prior to this appeal, Rule 43 is unavailable to the executrix. Furthermore, assuming arguendo (1) that the notice of appeal filed in this case was ineffective as to Albert Tate, and (2) that the executrix here had, in fact, six months in which to be substituted under Rule 25 (notwithstanding that there had been a final order entered before the expiration of the six-month period), the executrix did neither properly nor timely file in the circuit court her motion for substitution. Therefore, the motion for substitution is overruled and the appeal as to Albert Tate is due to be dismissed.

III.
The next issue presented is whether the trial court correctly determined that, as a matter of law, McMillan failed to timely and effectively exercise its option to purchase a portion of the Warrior stock. In its order, set out in pertinent part below, the trial court set forth its reasoning in reaching the conclusion that McMillan's exercise of its option was untimely and ineffective:
"The term of the option is specified in the option provisions,
"`... to remain in existence for a period of one year from the date of the execution of this instrument.'
"The instrument (option agreement) is clearly specified to have been made and entered into on April 11, 1980. Thus, by its terms, the option expired at midnight on April 10, 1981.
"The period of time within which an option is to be exercised is an inherent ingredient; and unlike a contract which calls for no stated time for performance, the period of time in the case of an option is of the essence of the agreement. Long v. Hirs, 270 Ala. 131, 116 So.2d 605 (1959); National Security Insurance Company v. Stewart, 43 Ala. App. 274, 188 So.2d 774 (1965).
"McMillan's option, assuming its validity, is an option `to purchase' designated stock at a specified price. The option agreement does not provide that McMillan (the Optionee) must only give notice of its intent to exercise its option within the time specified. By the method chosen by McMillan, McMillan attempts to transfer the responsibilities of exercising its option to Howell. This is contrary to the burden placed by law upon McMillan that it must timely exercise its option. The unambiguous wording of the agreement grants to McMillan `... the option to purchase ... with said option to remain in existence for a period of one year from the date of the execution of this instrument.' It is shown without dispute that McMillan did not purchase the Warrior stock within one year nor did it attempt to do so.
"Assuming further that timely notice of the exercise of its option is all that was required of McMillan, the general rule appears to be that such notice must be timely received by the other obligated party sufficient to bind the party exercising the option. Under the facts presented here, assuming the telegram was such notification, it has not been shown to have been received until April 13, 1981 two days after the option period had run. Prior to April 13 Howell had, at most, a third party who orally communicated to Howell McMillan's exercise of the option."
The trial court's reasoning and analysis are clearly flawed and virtually without any legal support whatsoever.
In Neely v. Denton, 260 Ala. 26, 29, 68 So.2d 537, 540 (1953), an option to purchase was defined:
"An option, in its inception, `is neither a sale nor an agreement to sell. It is simply a contract by which the owner of property agrees with another, that he shall have the right to buy the property at a fixed price within a time certain. He does not sell his land; he does not then agree to sell it; but he does then sell something, viz.: the right or privilege to buy at the option or election of the other party.' Cowin v. Salmon, 244 Ala. 285, *22 293, 13 So.2d 190, 196; Lauderdale Power Co. v. Perry, 202 Ala. 394, 395, 80 So. 476; Bethea v. McCullough, 195 Ala. 480, 487, 70 So. 680; Fulenwider v. Rowan, 136 Ala. 287, 303, 34 So. 975. But an option can be transformed into a mutually binding contract to sell and to buy by acceptance of the option. Asbury v. Cochran, 243 Ala. 281, 282, 283, 9 So.2d 887...."
In Fuller v. Totten, 222 Ala. 174, 175, 131 So. 435, 436 (1930), the Court explained that "the option holder cannot enforce it until he elects to and does bind himself." The Court went on to note that, in the usual case, the option holder's "notice of an election to exercise the option is sufficient." (Emphasis added.) Id. This view is supported by Professor Corbin in his treatise on contracts, 1A Corbin on Contracts, "Option Contracts," § 264, at 514-15 (1950):
"In most cases, the courts are likely to interpret the agreement in such a way that the contract will be held to be bilateral after a proper notice of acceptance. In such cases, the notice of acceptance is operative without any tender of the price; and this is true even though such tender may still be a condition of the duty to execute a conveyance." (Emphasis added.)
It is unquestionably true that:
"Just as in the case of all other offers, the offeror can prescribe any mode of acceptance that he pleases and he can make his offered promise conditional upon any facts and performances that he sees fit...."
Id. at 513.
Thus, the optionor may require that notice of acceptance be given in writing (Smith v. Cleveland, 289 Ala. 401, 268 So.2d 14 (1972)), or that the option be exercised by paying the purchase price within the stated time (Nashville Trust Co. v. Cleage, 246 Ala. 513, 21 So.2d 441 (1945)).
In Madison Limestone Co. v. McDonald, 264 Ala. 295, 87 So.2d 539 (1956), the option in question granted W.E. McDonald the right to purchase all the shares issued and outstanding on the books of the Madison Limestone Company for $210 per share. The option contract provided that half of the purchase price
"`shall be payable in cash upon the exercising of this option and the balance of said purchase price shall be and become payable in three (3) equal, annual installments. * * * The act of exercising, hereinabove mentioned, of this option shall be consummated by notice in writing to Lawson E. Jarrell, as president of Madison Limestone Co., Inc., and shall be accompanied by a tender of payment of the portion of the stipulated purchase price which is stipulated hereinabove to be paid in cash, said tender to be by either certified or cashier's check.' ..."
(Emphasis in original.) 264 Ala. at 298, 87 So.2d at 541. The Court held as follows:
"It is conceded, of course, that the acceptance of an option must be substantially as required by its terms and all conditions complied with. Asbury v. Cochran, supra. If a tender at the time of notice of acceptance is set up as a condition to its acceptance, the tender is necessary to make the acceptance complete unless there is a valid excuse for not doing so."
(Emphasis added.) 264 Ala. at 301, 87 So.2d at 544. Unlike the option contract in Madison Limestone Co. v. McDonald, supra, the option contract in the present case does not set up tender at the time of notice of acceptance as a condition to its acceptance. As further noted by Corbin, supra, at 518, "[i]n most cases the contemplated mode of acceptance by an option holder is the giving of a notice [within the stated period] resulting in a bilateral contract." Any restrictions or conditions on the mode of acceptance, must, therefore, be expressly stated by the optionor in the option contract.
Although we have not found a case on point in Alabama, there is ample authority for this view from other jurisdictions. Indeed, this view is unquestionably the general rule. One case quite similar to the present is Duprey v. Donahoe, 52 Wash.2d 129, 323 P.2d 903 (1958). In that case, the instrument involved was a lease on real *23 property with an option to purchase, and it provided, in pertinent part:
"Lessors in addition hereby give, grant and convey to Lessees the right and option to purchase said real estate at any time within the term of this lease for a total purchase price of $12,500 in cash...."
52 Wash.2d at 131, 323 P.2d at 904. No conditions of acceptance were stated in the option. The lessees sought to exercise their option, one of them stating, "I am exercising my option," in response to a specific inquiry made by the attorney for the lessors. However, by letter, lessees also sought an extension of the option in order to acquire Federal Home Administration financing. Some two weeks later, the lessors notified lessees by letter that, in their opinion, the option had not been exercised according to its terms "`because such agreement requires the purchase price to be paid in full within the period covered by the option agreement.'" 52 Wash.2d at 132, 323 P.2d at 905. The Supreme Court of Washington held that the giving of notice that the lessees were exercising their option constituted an acceptance within the terms of the option provision. That court explained:
"In the absence of any provision in the option contract with reference to the manner by which an option can be exercised, it is the general rule that any manifestation, either oral or written, indicating an acceptance on the part of the optionee is sufficient. 55 Am.Jur. 507, § 38; 1 Corbin on Contracts 872, § 264.
"Appellants contend that the written acceptance which was delivered on the same day that the oral acceptance was made indicated a conditional acceptance, when a request was made for an extension of the option.
". . .
"The general rule is that,
"`* * * If the optionee attaches conditions not warranted by the terms of the option to his acceptance or notice of his election to buy, this itself amounts to a rejection; but it is otherwise where the acceptance is in the first instance unconditional, and a mere request is added for a departure from the terms of the option as to the time and place of completing the transaction.' [Emphasis added in Duprey.] 55 Am.Jur. 508, § 39.
"To the same effect, 91 C.J.S. Vendor & Purchaser § 10, p. 855.
"The written acceptance was simply a request for an extension of the option and does not indicate that the acceptance was conditioned upon the granting of the request.
"Nor do we agree with appellants' contention that the exercise of the option required a tender of the cash at the time the option was exercised.
"The option contract provided (a) that the purchase price of the property at the time the option was exercised would be fixed at $12,500, and (b) that the sale must be in cash. The words, `in cash,' mean a cash sale, as distinguished from an executory contract of sale. A cash sale has been defined as `one conditioned on payment concurrent with delivery of the deed.' Hecketsweiler v. Parrett, 1948, 185 Or. 46, 200 P.2d 971, 974. See, also, Loewi v. Long, 1913, 76 Wash. 480, 486, 136 P. 673.
"When, as here, no time is specified in the option agreement for the final payment and delivery of the instruments of conveyance, the time of payment and delivery is a reasonable time after acceptance of the offer. 91 C.J.S. Vendor & Purchaser § 8, p. 852.
"There is a distinction between an acceptance of an offer to purchase and the closing of a sale, after the option has been exercised. The acceptance of an offer to sell real estate creates a binding obligation on both parties. The closing of the sale thereafter is the fulfillment of the obligations created by the contract. We conclude that, when the closing date is not definitely fixed in the contract, a reasonable time after acceptance must be allowed to perform. See Foelkner v. Perkins, 1938, 197 Wash. 462, 85 P.2d 1095, and cases cited."
*24 (Emphasis added.) 52 Wash.2d at 133-35, 323 P.2d at 905-06. See also cases collected in the annotations to the following passages quoted from Am.Jur.2d and A.L. R.3d:
"Where the option by its express terms requires that the payment of the purchase money or a part thereof accompany the optionees's election to exercise the option, the making or tender of the payment specified, unless waived by the optionor, is a condition precedent to the formation of a contract to sell. On the other hand, the terms of the option may require merely that notice be given of the exercise thereof, and may not require the payment of the purchase money in order to exercise the option. Under options of the latter kind, payment of the purchase price is generally regarded as something which the buyer is required to do in order to perform a contract to sell which has previously been made, and not a condition precedent to the formation of a contract. Whether the purchase price or a part thereof must be paid or tendered in order to exercise an option is, therefore, a matter of construction of the particular option involved...."
(Emphasis added.) 77 Am.Jur.2d Vendor and Purchaser, § 44 (1975), pp. 226-27.
"[W]here an option contract does not provide for payment of the purchase price at the time of, or coincident with, an optionee's exercise or attempted exercise of the option, or where such contract is silent as to the time of payment, the courts have usually adhered to the view, sometimes referred to as the general rule, that in such circumstances payment is not a necessary requisite to exercise but is instead simply one of the acts required of the optionee in performance of his part of the bilateral contract of purchase and sale which was formed when he communicated to the optionor his election and intention to exercise the option and thereby accepted the option[or]'s offer."
Annot., "OptionNecessity of Payment or Tender," 71 A.L.R.3d 1201, 1205-06 (1976).
In the present case, it is undisputed that on April 10, 1981, a day which was within "the period of one year from" April 11, 1980, the date the option agreement was executed, McMillan gave notice to Howell of its exercise of the option to purchase 100,000 shares of Warrior stock. We hold that this notice by McMillan was an effective exercise of its option, and that tender of payment of the purchase price is "simply one of the acts required of [McMillan] in performance of [its] part of the bilateral contract of purchase and sale which was formed when [it] communicated to [Howell its] election and intention to exercise the option and thereby accepted [Tucker's (now Howell's)] offer." Id.

IV.
Howell and Warrior contend that even if this Court holds that the rationale of the trial court's order granting summary judgment is incorrect, that judgment, nevertheless, is due to be affirmed on one or all of the grounds ruled on adversely to Howell and Warrior by the trial court in the amendment to its final order. McMillan strongly argues, however, that Howell and Warrior are precluded from raising any issues or assigning any error on appeal by their failure to file an appeal or cross-appeal from the trial court's amended order. We agree. Notwithstanding that perhaps a different rule obtains in the federal system, the law of Alabama is well-settled on this point. In the absence of taking an appeal, an appellee may not cross-assign as error any rulings of the trial court adverse to appellee. Ex parte Army Aviation Center Federal Credit Union, 477 So.2d 379 (Ala.1985); Johnson v. Haynie, 414 So.2d 946 (Ala.1982); Beaty v. Head Springs Cemetery Ass'n, Inc., 413 So.2d 1126 (Ala.1982); Protective National Ins. Co. of Omaha v. Bell, 361 So.2d 1058 (Ala. 1978); Mutual Savings Life Ins. Co. v. Montgomery, 347 So.2d 1327 (Ala.1977); Price v. South Central Bell, 294 Ala. 144, 313 So.2d 184 (1975); State v. Southland Hatchery, 253 Ala. 449, 45 So.2d 302 (1950); Dickerson v. Stewart 473 So.2d 1078 (Ala.Civ.App.1985); First Ala. Bank of Montgomery, N.A. v. Parsons, 390 *25 So.2d 640 (Ala.Civ.App.1980); State Dept. of Industrial Relations v. Deslattes, 372 So.2d 867 (Ala.Civ.App.), cert. denied, 372 So.2d 872 (Ala.1979); Boswell v. Samson Banking Co., 368 So.2d 547 (Ala.Civ.App. 1978), cert. denied, 368 So.2d 552 (Ala. 1979); Headley v. Housing Authority of Prattville, 347 So.2d 532 (Ala.Civ.App. 1977); Hudson v. DuraWear Corp., 344 So.2d 182 (Ala.Civ.App.1977).
Nevertheless, Howell and Warrior contend that it would have been improper for them to have appealed from a favorable judgment. The inquiry as to the propriety of an appeal does not end with the conclusion that the judgment below was, in its result, favorable to appellee. The question then becomes "whether any ruling adverse to the [appellee] has been rendered by the trial court from which the [appellee] may maintain an appeal." Mobile Fuel Shipping, Inc. v. Scott, 360 So.2d 1028 (Ala.Civ.App.1978). See also Tyson v. United States Pipe & Foundry Co., 286 Ala. 425, 240 So.2d 674 (1970). Unquestionably, the rulings of the trial court in its amended order were adverse to Howell and Warrior. That being the case, a cross-appeal as to these rulings not only would have been proper, but also was necessary in order to preserve them for this Court's review.
Based on the foregoing, we hold that the judgment below is due to be, and it is hereby, reversed and the cause remanded for further proceedings.
MOTION FOR SUBSTITUTION OF PARTIES OVERRULED AND APPEAL DISMISSED AS TO PARTNER TATE.
REVERSED AND REMANDED AS TO PARTNER McMILLAN.
TORBERT, C.J., and MADDOX, ALMON and HOUSTON, JJ., concur.

ON APPLICATION FOR REHEARING
PER CURIAM.
Appellees on rehearing ask that we reexamine the question of whether they were required to file a cross-appeal in order to preserve for appellate review the question of whether summary judgment was properly granted on grounds other than those relied upon by the trial court. Appellees' argument that no cross-appeal was required is well taken.
We find that the proper rule is set forth by Professor Moore:
"[A]n appellee, though he files no cross-appeal or cross-petition, may offer in support of his judgment any argument that is supported by the record, whether it was ignored by the court below or flatly rejected. The classic statement of this principle appears in the opinion of Mr. Justice Brandeis, speaking for a unanimous Court in United States v. American Railway Express Co. [, 265 U.S. 425, at 435, 44 S.Ct. 560, at 564, 68 L.Ed. 1087] in 1924:
"`[A] party who does not appeal from a final decree of the trial court cannot be heard in opposition thereto when the case is brought here by the appeal of the adverse party. In other words, the appellee may not attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary, whether what he seeks is to correct an error or to supplement the decree with respect to a matter not dealt with below. But it is likewise settled that the appellee may, without taking a cross-appeal, urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it.'
"By 1937, this formulation was referred to by the Court as `inveterate and certain,' and it has been reiterated many times since then."
9 J. Moore and B. Ward, Moore's Federal Practice ¶ 204.11[2] (2d ed. 1985). None of the cases cited on original deliverance for support of the opposite rule deals with this precise issue. In all of those cases, the appellee was attempting to argue for alteration of the judgment to enlarge his rights. Under such circumstances, those cases correctly held that a cross-appeal must be *26 filed. In this case, appellees merely seek to argue grounds other than those relied upon by the trial court that support the summary judgment and in no way seek any more than what they have already obtained.[2]
We have held that we will affirm a summary judgment if it was properly granted, notwithstanding the fact that the trial court gave the wrong reasons for granting it. Boyd v. Brabham, 414 So.2d 931 (Ala. 1982); Bank of the Southeast v. Koslin, 380 So.2d 826 (Ala.1980). In neither of those cases was a cross-appeal filed. The only special aspect of this case is that the trial court specifically rejected the alternative grounds argued in support of the motion for summary judgment. According to Moore's Federal Practice, supra, that makes no difference. Furthermore, that was also true in Century 21 Preferred Properties, Inc. v. Alabama Real Estate Comm'n, 401 So.2d 764 (Ala.1981), and, in footnote 4 of that opinion, we noted that no cross-appeal was necessary in order for appellees to argue that the rejected ground supported the trial court's judgment. (See note 2.) In any event, we see no reason why this factual difference should lead to a different rule.
Having concluded that appellee properly presented for our consideration arguments based on alternative grounds for affirming the summary judgment, we now turn to the merits of those arguments.

V.
The only significant argument made by Howell and Warrior is that, under Code of 1975, §§ 7-8-301 and -302, Howell was a bona fide purchaser of Tucker's stock, and, therefore, took free of any adverse claims. Specifically, Howell and Warrior contend that the option Tucker gave McMillan, in consideration for the $300,000 loan, did not create an "adverse claim" within the meaning of §§ 7-8-301 and -302, supra.[3] These sections are set out in pertinent part below:
§ 7-8-301:
"(1) Upon delivery of a security the purchaser acquires the rights in the security which his transferor had or had actual authority to convey.... `Adverse claim' includes a claim that a transfer was or would be wrongful or that a particular adverse person is the owner of or has an interest in the security.
"(2) A bona fide purchaser in addition to acquiring the rights of a purchaser also acquires the security free of any adverse claim."
§ 7-8-302:
"A `bona fide purchaser' is a purchaser for value in good faith and without notice of any adverse claim who takes delivery of a security in bearer form or of one in registered form issued to him or indorsed to him or in blank."
Comment 4 to § 7-8-301 states:
"An adverse claim may be either legal or equitable, e.g., that the claimant is the *27 beneficial owner of a security, though not the legal owner of it, or that it has been or is proposed to be transferred in breach of trust or a valid restriction on transfer (See Section 7-8-204 and Comment)."
Neither of the parties has cited, nor has our research disclosed, any cases in which a court has dealt with the precise question of whether an unexercised option constitutes an adverse claim within the meaning of §§ 7-8-301 and -302. However, we do find instructive the following observations from 7 Hawkland, Alderman & Schneider, UCC Series, §§ 8-301:05 and 8-302:05 (Art. 8) (1986):
"Adverse claim is broadly defined in subsection 8-301(1) to include `a claim that a transfer was or would be wrongful or that a particular adverse person is the owner of or has an interest in the security.' Note that the definition is not exclusive. Use of the word `includes' makes it clear that there are other things that may constitute an adverse claim and the examples used are merely illustrative.

". . .
"In order to justifiably grant a bona fide purchaser extraordinary protections, including the ability to take free of adverse claims, the purchaser certainly must not have been aware of the claims when he took the security. This is the rule of section 8-302: a bona fide purchaser must purchase for value, in good faith, and `without notice of any adverse claim....'
"While `adverse claim' is not specifically defined in Article 8, it includes `a claim that the transfer was or would be wrongful or that a particular adverse person is the owner of or has an interest in the security.' As this definition indicates, adverse claim is not restricted to an adverse ownership interest. Rather, it includes any adverse claim, including claims that the transfer was made without proper authority or in violation of an agreement."
(Footnotes omitted.) (Emphasis added.) Id. at 188, 199-200. Under the above guidelines, we conclude that an unexercised option contract to purchase stock can constitute an adverse claim for purposes of determining bona fide purchaser status under § 7-8-302. It is not necessary that the adverse claim be an adverse ownership interest, and, therefore, this Court's decision in Shaffer v. Reed, 437 So.2d 98 (Ala. 1983), in no way conflicts with our analysis and reasoning herein. In Shaffer, this Court held that an option to purchase property "is a mere right to purchase within a limited time" and does not give the optionee "any right to or interest in the property until he ... exercise[s] his right of option within the time specified." (Emphasis added.) 437 So.2d at 99. Nevertheless, that "mere right to purchase" is a contractual right and is enforceable as such. To that extent, Tucker's sale of his stock to Howell was in violation of his option agreement with McMillan, especially in view of Tucker's knowledge that Howell would be acquiring more than 90 percent of Warrior's outstanding stock in an attempt to make Warrior a wholly-owned subsidiary of Howell.
Howell concedes that it received McMillan's letter dated October 20, 1980, in which counsel for McMillan expressly notified Howell of McMillan's outstanding option and asserted that any stock Howell purchased from Tucker would be subject to the outstanding option. If Howell had not already been given notice of the McMillan option (and Tucker's testimony, as well as other facts, indicates that Howell had been given such notice), the October 20 letter served as actual notice of the option, and it also served to make Howell aware that McMillan regarded any interest in Tucker's stock that Howell planned to acquire subject to (and, therefore adverse to) McMillan's option. Thus, Howell received actual notice of an adverse claim prior to taking delivery of Tucker's stock on December 2, 1980. See § 7-8-302, quoted supra. Accordingly, we hold that Howell failed to meet the criteria necessary to becoming a bona fide purchaser. Therefore, appellees were not entitled to summary judgment on the theory that Howell was a bona fide purchaser of Tucker's stock.
*28 Appellees contend that if this Court holds that an unexercised option contract constitutes an adverse claim, the main objective of Art. 8, ease of negotiability, will be entirely defeated. We agree that ease of negotiability of investment securities is one of the underlying objectives of Art. 8. Nevertheless, § 7-8-301 is an indication that the authors of the Code thought it necessary and important to protect adverse claimants from subsequent purchasers of stock who failed to prove those prerequisites to one of the most elevated positions in lawbona fide purchaser status. The "ease of negotiability" doctrine underlying Art. 8 is designed to protect those who are, in fact, bona fide purchasers, and save them the necessity of endless inquiry into the validity of transfers. However, that doctrine is not served by allowing a purchaser of stock to take free of claims of which it has actual notice, but which it chooses to disregard on the assumption that the claimant will not exercise its rights to the stock.

VI.
Appellees further contend that summary judgment in their favor was proper because McMillan is not entitled to the equitable remedy of specific performance for the following reasons:
(1) McMillan has an adequate remedy at law against Tucker in the form of money damages;
(2) There is no contract for the sale of stock between Howell and McMillan;
(3) The alleged option agreement violates the Statute of Frauds; and
(4) The alleged option agreement between Tucker and McMillan is too indefinite in its terms to be specifically enforced.
As to reason (4) above, we find appellees' arguments totally without merit, as we cannot state, as a matter of law, that the option agreement is too indefinite in its terms to be specifically enforced. Indeed, we find curious appellees' assertion that part of the indefiniteness of the option agreement lies in the use of the term "outstanding" voting common stock. Appellees contend that "[n]owhere in the alleged option agreement is `outstanding' stock defined," and argue that its meaning is unclear. However, in their statement of facts in their brief to this Court, appellees themselves use the term "outstanding stock" to describe the Warrior stock purchased by Howell:
"On August 25, 1980, Howell delivered to Tucker a written offer to acquire all of the outstanding stock of Warrior (R. at 1209-1210) for an initial offer price of $3.28 per share.
". . .
"... To the contrary, McMillan ... [knew] that Howell was purchasing virtually all of the outstanding stock of Warrior." (Emphasis added.)
With respect to reason (3) above, the Statute of Frauds defense, we find the reasoning of the trial court to be sound and adopt it herewith:
"Howell contends ... that the contract would be unenforceable because of the requirements of the Statute of Frauds. Section 7-8-319, Code of Alabama 1975. Howell argues that there would be no mutuality of obligation arising out of McMillan's exercise of the option in that McMillan did not actually sign the Mailgram from Western Union. Section 7-1-201(46), Code, supra, defines `written' or `writing' to include printing, typewriting, or any other intentional reduction to tangible form. Here, the Mailgram which has McMillan's name at the bottom provides a `writing' sufficient to satisfy the Statute of Frauds.
"Howell further asserts the Statute of Frauds as a defense by contending that it did not sign and was not a party to the contract which is sought to be enforced. Howell claims that the option contract was between Tucker and McMillan and that the option must be signed by Howell to be enforceable. The Court is of the opinion that the Statute of Frauds has no application in this regard. The real issue is whether Howell, as Tucker's transferee, can raise the defense of the Statute of Frauds where that defense would be unavailable to Tucker. The option *29 was executed by Tucker and would be enforceable against Tucker were he now the owner of the shares of stock involved.
"Pursuant to § 7-8-301, Code, supra, upon delivery of the stock from Tucker to Howell, Howell only acquired those rights in the stock which Tucker had. One who succeeds to all of the rights of a party to a contract may use the Statute of Frauds as a defense, provided his predecessor in interest could have raised that defense, but not otherwise. Therefore, since Tucker could not assert the Statute of Frauds due to the existence of a sufficient written memorandum granting the option, Howell, as Tucker's successor in interest, would likewise be barred since its rights are derivative from Tucker. Section 7-8-301(1), Code, supra."
The real issue presented by reasons (1) and (2) above is whether, on this record, we can hold, as a matter of law, that McMillan is not entitled to specific performance of its option as against Howell, Tucker's transferee. We hold that, if McMillan, having exercised the option, can prove to the satisfaction of the trial court "circumstances justify[ing] the equitable remedy of specific performance," then McMillan is entitled to enforce that remedy against Howell. Nashville Trust Co. v. Cleage, 246 Ala. 513, 517, 21 So.2d 441, 444 (1945). See also Ingram v. Omelet Shoppe, Inc., 388 So.2d 190, 197 (Ala.1980); Madison Limestone Co. v. McDonald, 264 Ala. 295, 87 So.2d 539 (1956); Boozer v. Blake, 245 Ala. 389, 17 So.2d 152 (1944); General Securities Corp. v. Welton, 223 Ala. 299, 135 So. 329 (1931).
Unquestionably, genuine issues of fact exist as to whether McMillan is entitled to specific performance. Appellees contend that money damages against Tucker for breach of the option contract would be an adequate remedy at law, thereby precluding specific performance. Appellees point to purported expert evidence in the form of an affidavit given by Mr. Harry Van Sandt (which they claim is uncontradicted) establishing that the Warrior stock "has a determinable fair market value, which can be determined as of any point in time." Thus, they argue that, under the rule stated in Hurley v. Thomas, 169 So.2d 519 (Fla.Dist. Ct.App.1964), money damages would be a complete and adequate remedy in this case.
McMillan, on the other hand, cites this Court to the cases and authorities cited with approval in General Securities Corp. v. Welton, supra, which stand for the proposition that, even where the value of the securities can be ascertained, where that value is not easily ascertained and there are other factors, such as the unobtainability of the stock in the market "without great inconvenience and expense, the purchaser is entitled to a decree of specific performance." Welton, 223 Ala. at 303, 135 So. at 332. We quote further from Welton at length because of the similarities between the cases analyzed therein and the present case:
"See note citing Gould v. Womack, 2 Ala. 83, where it is said:
"`The question is not, what the Court must do, but what it may do, under the circumstances, 12 Vesey, Jr. 331. So in the case of Seymour v. Delancey, 6 Johns. Ch. [N.Y.] 222, Chancellor Kent says, "It is a settled principle, that a specific performance of a contract of sale, is not a matter of course, but rests entirely in the discretion of the court, upon a view of all the circumstances." The same effect, are the opinions of Lord Somers, Lord Macclesfield, and other eminent English Chancellors.
". . .'
"... And in this jurisdiction the specific performance of contracts will be decreed when, under all the circumstances of that case, such action and decree better subserve the ends of justice; and it will be denied when, from a like view, it appears that it will produce hardship or injustice to either of the parties....
"We will advert to general authorities that are cited by counsel. The case of Butler v. Wright, in the Appellate Division of the Supreme Court of New York, 103 App.Div. 463, 93 N.Y.S. 113, is cited by appellant as authority for the proposition *30 that the mere fact that the value of the stock, which is the subject-matter of the executory contract relating to personal property, is not readily ascertainable does not render the remedy at law inadequate; was later and again considered in Butler v. Wright, 186 N.Y. 259, 78 N.E. 1002, 1003, by the Court of Appeals, and was reversed upon the ground that it was impossible to say as a matter of law that the facts proved by the complainant did not entitle him to the relief granted. In reaching this result the Court of Appeals commented as follows: `... The rule is that, as to contracts pertaining to personal property, a party should be confined to his action for damages, unless it appears that he is entitled to the thing contracted for in specie, which to him has some special value, and which he cannot readily obtain in the market, or in cases where it is apparent that compensation in damages would not furnish a complete and adequate remedy. But in each case the question as to whether a court of equity will take jurisdiction and grant the relief asked for rests in the sound discretion of the court, and it cannot be demanded as a matter of right. [Citations omitted.]'
"... The opinion of the Court of Appeals of New York in the case of Waddle v. Cabana, 220 N.Y. 18, 114 N.E. 1054, indicates that after some confusion, the New York court accepted the generally prevailing rule that where the complainant shows that the value of the stock sought is not easily ascertainable, or that the stock cannot be obtained in the market without great inconvenience and expense, the purchaser is entitled to a decree of specific performance.
"In his book on Stock and Stockholders, Mr. Cook states the New York rule upon this subject to be as follows:
"`It frequently happens that the person who has contracted to purchase stock is particularly anxious to procure that stock, and that, under the circumstances of the case, the stock is worth to him a value not to be compensated for by mere money damages. * * *
"`An entirely different rule prevails as regards contracts for sale of stock of private corporations. If the stock contracted to be sold is easily obtained in the market, and there are no particular reasons why the vendee should have the particular stock contracted for, he is left to his action for damages. But where the value of the stock is not easily ascertainable, or the stock is not to be obtained readily elsewhere, or there is some particular and reasonable cause for the vendee's requiring the stock contracted to be delivered, a court of equity will decree a specific performance and compel the vendor to deliver the stock.

". . .'
"In the case of Northern Central Railroad Co. v. Walworth, 193 Pa. 207, 44 A. 253, 255, 74 Am.St.Rep. 683, the Pennsylvania court announces the same rule. ... In the opinion, holding that the demurrers should have been overruled, the court makes the statement that: `The same general principles govern in contracts for the sale of stocks of this character as in the sale of other personal property. If the breach can be fully compensated, equity will not interfere; but when, notwithstanding the payment of the money value of the stock, the plaintiff will still lose a substantial benefit, and thereby remain uncompensated, specific performance may be decreed....' [The court] cites with approval Goodwin Gas Stove & Meter Co.'s Appeal, 117 Pa. 514, 528, 12 A. 736, 2 Am.St.Rep. 696, where the Pennsylvania court affirmed the judgment of the Philadelphia court of common pleas sustaining a master's report that contained the following statement: `The stock is not listed in the Stock Exchange of this city or elsewhere. It cannot be bought in the market. It has no market price. So far as the master is informed there have been no open sales, all transfers having presumably been inter partes. It would seem to be difficult, if not impossible, to measure in money the value of such stock. Based upon its earning power, an estimate could be made of its value, and *31 that sum of money fixed as the damages. The remedy then would not be complete.'
"In the case of Safford v. Barber, 74 N.J.Eq. 352, 70 A. 371, the Chancery Court of New Jersey approved the rule as announced by the Pennsylvania court and decreed specific performance of a contract to sell shares of stock in a commercial corporation, holding that, `Where the corporate stock to which a contract of sale relates is not procurable in the market, and its pecuniary value is not readily ascertainable, specific performance will, as a rule, be decreed.'
"In Manton v. Ray, 18 R.I. 672, 29 A. 998, 999, 49 Am.St.Rep. 811, from the Supreme Court of Rhode Island, the bill was for specific performance of a contract to deliver certain certificates of stock, and the court stated: `... The allegation that the value of the stock is uncertain, and not easily ascertainable, brings the case within the class of exceptionable cases where there is not an adequate remedy at law. The true standing of a corporation is seldom known, outside of its own officers. A stranger would in most cases find it difficult, if not impossible, to prove the real value of its stock, unless it is one that is rated and for sale in the market. He has no access to its books; he cannot know its assets and liabilities; and, although he is willing to take the stock for a price, he might be quite unable to prove that it was worth that or any other price. No one can say that the remedy of damages, in such a case, is an adequate remedy. But there is a stronger reason for sustaining the bill. If it be assumed that the stock cannot be obtained elsewhere than of the respondent, and that he has made a valid contract for this particular stock, it is also to be assumed that he wants this stock in specie. To deny this remedy would be to deny him the substantial benefit of his contract.'
"In New England Trust Co. v. Abbott, 162 Mass. 148, 154, 38 N.E. 432, 434, 27 L.R.A. 271, the Massachusetts court held that a decree for specific performance of an agreement to sell shares of stock in a corporation was proper upon the ground that it clearly appeared that it would be difficult to ascertain damages, because the stock in question had not been bought and sold on the open market. Mr. Justice Morton said: `The defendant contends that the plaintiff is not entitled to specific performance, because the stock was greatly undervalued, and because the plaintiff has a remedy at law. It is evident that to remit the plaintiff to an action at law for damages would defeat the very purpose of the contract, and would not, we think, furnish an adequate remedy. No stock in the plaintiff company has ever been sold in the market, and all the shares that have been transferred have been transferred to the plaintiff, and disposed of by the directors in the manner provided. About three-fourths of the stock of the original subscribers has been thus transferred. There is no evidence that the testator ever objected to this mode of dealing with it; and we see no good reason why the plaintiff should be obliged to accept damages for which it might be difficult to lay down a clear rule, instead of performance. Western Railroad Corp. v. Babcock, 6 Metc. (Mass.) 346; Cushman v. Thayer Manuf. Jewelry Co., 76 N.Y. 365 [32 Am.Rep. 315]. The case would perhaps stand differently if the shares were bought and sold in the market, like most stocks. Adams v. Messinger, 147 Mass. 185, 17 N.E. 491 [9 Am.St.Rep. 679].'
"See also, Hills v. McMunn, 232 Ill. 488, 83 N.E. 963; Smurr v. Kamen, 301 Ill. 179, 133 N.E. 715, 22 A.L.R. 1023.
"In Hyer v. Richmond Traction Co., 168 U.S. 471, 18 S.Ct. 114, 119, 42 L.Ed. 547, 551, the Supreme Court of the United States, in considering a contract for the transfer of corporate stock, says through Mr. Justice Brewer: ` * * * If it be considered as a contract specifically for the transfer of stock, what is the rule in respect to actions in case of a breach thereof? If stock has a recognized market value, courts will ordinarily leave the parties to their action at law for damages for breach of the agreement to sell; but in cases where the stock has no recognized market value, is not purchasable in the market, or has a value which is not settled, but contingent upon the future *32 workings of the corporation, equity will sometimes decree specific performance of a contract of purchase.'..."
(Emphasis added.) 223 Ala. at 302-04, 135 So. at 331-33.
After its analysis of similar cases from other jurisdictions, the Court in Welton examined the allegations of the plaintiff's complaint in that case in light of the authorities set out in that case, ultimately concluding that the trial court correctly overruled the demurrers to plaintiff's complaint:
"In his original bill the complainant avers that the shares of stock represented by the certificate, which he seeks in this case, (1) are not listed on any stock exchange; that (2) their market value is not readily ascertainable, and that the value of the certificate `wrongfully withheld depends upon the value of the shares which cannot be readily ascertained.' In an action for breach of contract in which his measure of damages would be the difference between the purchase price called for by the contract, and the market value of the 60 shares of stock in the St. Louis Aviation Corporation, would such action at law be adequate, for that complainant could not recover at law until he had proved the market value of the 60 shares at the time delivery was to be made? Does the bill set out facts sufficient to show that there is no practical way in which the plaintiff could discharge this burden of proof? It is urged that since the contracting parties had set an arbitrary sale price upon the shares of stock, the plaintiff is deprived of his equitable remedy. This does not meet complainant's difficulty if he sues at law. It is true that the purchase price for the 60 shares of stock is settled as of date of contract, but there still remains the question of the reasonable market value of said shares when the contract was breached. The damages to which the plaintiff would be entitled in an action at law would be the difference between the valuation placed upon the 60 shares of aviation stock and the market value at the time of breach.
". . .
"The averments of the original bill are that all remaining for the complainant to do in this case is to deliver to the respondent 10 shares of stock in the City Bank & Trust Company, and $160 in cash; the respondent to deliver the 60 shares of stock in the St. Louis Aviation Corporation issued by that company and sent defendant for delivery to plaintiff; and complainant avers that he is ready, able, and willing to do this. There was tender and payment into court by the complainant. In such case there is no reason why a decree of the court, ordering the respective deliveries that may be immediately, easily, and readily enforced, should not be made.
". . .
"The original bill of complaint in this cause contains equity; both (1) upon the ground that where the value of the shares called for by the contract cannot be ascertained a contract for the sale or exchange of such corporate shares may be specifically enforced; and (2) upon the ground that the certificate so issued and sought by the plaintiff in this cause is a muniment of title, and therefore the agreement, on the part of the defendant to deliver to him, may be specifically enforced. That pleading was not subject to demurrer assigned, and the decree is affirmed."
223 Ala. at 305-06, 135 So. at 334-35.
In the present case, McMillan alleges the following with respect to the Warrior stock:
"(1) The Warrior stock is special or unique property, and represents the ownership of special or unique property, consisting primarily of an oil pipeline, oil and gas producing properties, and oil and gas reserves (all real estate interests);
"(2) There is no fixed or readily ascertainable market value of the shares;
"(3) The shares are not listed on any stock exchange;
"(4) The shares cannot be purchased on an exchange nor can they be readily purchased elsewhere;

*33 "(5) Warrior is now a close corporation with Howell owning over 98% of the stock at the time McMillan exercised the option; and
"(6) Money damages for breach are inadequate since the value of the shares is likely to increase dramatically if the ventures (oil and gas) of the company prove successful."
McMillan further contends that Mr. Van Sandt's affidavit, relied upon by appellees, creates no fact issue and does not establish a "readily ascertainable market value" for the Warrior stock so as to defeat specific performance. Specifically, McMillan contends that the affidavit does not purport to establish the readily ascertainable market value; the affidavit states no value of the stock; Mr. Van Sandt has allegedly determined the value of the stock as of August 31, 1981, a date irrelevant to this lawsuit; and, since under Rule 56(e), A.R.Civ.P., an affidavit in support of or in opposition to summary judgment "shall set forth such facts as would be admissible in evidence," Mr. Van Sandt's affidavit should not even be considered, in view of its irrelevance. McMillan also argues that the mere fact that an expert states that it is possible for him to form an opinion as to the value of stock in a close corporation at any point in time clearly is insufficient to constitute proof of a "readily ascertainable market value." McMillan points out that Mr. Van Sandt testified in his affidavit that it took him three weeks to determine the value of the stock as of August 31, 1981, arguing that certainly this is not a "readily ascertainable market value" to defeat specific performance.
More importantly, however, McMillan points out that Darby Sere, vice president of acquisitions for Howell, testified that Howell had acquired 98% of the Warrior stock, that the stock had never been traded publicly, that the Warrior stock did not have a readily ascertainable market value, and that none of the stock was for sale.
Specifically, Mr. Sere said:
"Q. Do you have any judgment as to approximately what percentage of the Warrior stock was ultimately acquired by Howell Petroleum Corporation?
"A. It seems to me that it was up in the 98 percent range.
"Q. There was approximately 2 percent that was not tendered?
"A. Right.
"Q. Since its acquisition of that 98 percent of the stock of Warrior, has there been any market for the Warrior Drilling stock that you know of?
"A. Not that I know of.
"Q. Do you know if the Warrior Drilling stock has a readily ascertainable value?

"A. No. It certainly doesn't have a readily ascertainable market value.

"Q. Okay. To your knowledge, has any of the Warrior Drilling stock owned by Howell been for sale since its acquisition by Howell Petroleum?
"A. No.
"Q. From the time that Howell Petroleum Corporation bought up to 98 percent of the stock of Warrior and until you left the company, what were the general assets of Warrior? Just the general categories?
"A. Well, there was the natural gas pipeline, the reserves in the ground that were owned by Warrior, the undeveloped acreage owned by Warrior, the trucks, supply store, communications division. The rights were soldI don't recall what day, but they were sold. You know, the heavy equipment and things.
"Q. Was the bulk of the assets of Warrior during that period of time in the reserves and in the undeveloped leases and in the undeveloped leases and in the pipeline itself?
"A. Yes."
(Emphasis added.) Mr. John Benton, vice president and general counsel for Howell, testified to the same effect:
"Q. How manywhat approximate percentage of the stock of Warrior Drilling did Howell Petroleum Corporation acquire prior to, say, April of 1981.
"A. I think about 98 percent.

*34 "Q. Okay. Was the Warrior Drilling stock ever, during that period of time, traded publicly on any exchange?
"A. Warrior Drilling stock?
"Q. That's correct.
"A. To my knowledge, it was never traded publicly on any exchange.
"Q. Without getting into the evaluation question, is the value of Warrior Drilling stock a readily ascertainable value?

"A. No.

"Q. Okay. And since the acquisition of Warrior Drilling stock by Howell Petroleum Corporation, has any of the stock of Warrior Drilling been held for sale?
"A. No. Well, excuse me. None that we have held.
"Q. None that Howell Petroleum Corporation has held?
"A. That's right.
"Q. And at the time of acquisition of Warrior by Howell Petroleum Corporation, would it be fair to say that the bulk of the assets were in oil and gas reserves and in the pipeline?
"A. Yes. I think you could probably include the drilling rigs in that. They were very substantial."
(Emphasis added.) Appellees do not in any way dispute McMillan's allegations with respect to the virtually total unavailability of Warrior stock, the particular nature of the Warrior assets, and the resulting special value of this stock to McMillan. In fact, appellees respond to McMillan's contentions only by citing the case of the Florida Court of Appeals, Hurley v. Thomas, supra, to bolster Van Sandt's affidavit, and by arguing that the testimony of Sere and Benton "must be viewed in the context in which it was given." With respect to Sere's and Benton's testimony concerning the value and availability of the Warrior stock, we find that the following statement from the case of Manton v. Ray, 18 R.I. 672, 29 A. 998, 999, quoted in Welton, supra, is apropos and bears repeating:
"The allegation that the value of the stock is uncertain, and not easily ascertainable, brings the case within the class of exceptional cases where there is not an adequate remedy at law. The true standing of a corporation is seldom known, outside of its own officers. A stranger would in most cases find it difficult, if not impossible, to prove the real value of its stock, unless it is one that is rated and for sale in the market. He has no access to its books; he cannot know its assets and liabilities; and, although he is willing to take the stock for a price, he might be quite unable to prove that it was worth that or any other price. No one can say that the remedy of damages, in such a case, is an adequate remedy. But there is a stronger reason for sustaining the bill. If it be assumed that the stock cannot be obtained elsewhere than of the respondent, and that he has made a valid contract for this particular stock, it is also to be assumed that he wants this stock in specie. To deny this remedy would be to deny him the substantial benefit of his contract."
In view of the above authority, as well as the others followed by this Court in Welton, quoted from at length herein, we find totally without merit appellees' contention that, on the state of this record, they are entitled to summary judgment on McMillan's claim for specific performance. Indeed, we think that the only matter (in connection with McMillan's claim for specific performance) that genuinely merits discussion, in the procedural and factual posture of this case, concerns, not the factual issue of whether McMillan is entitled to the remedy of specific performance, but whether McMillan is entitled to pursue that remedy against Howell, a third-party purchaser from Tucker, the optionor. For aught that appears, this is an issue of first impression in this jurisdiction insofar as the property subject to the option is personalty as opposed to realty.
There is ample authority for the proposition that a holder of an option to purchase real property, given for a valuable consideration and duly accepted, may maintain a suit for specific performance against a subsequent purchaser of the property with notice *35 of the option. See Annot., 50 A.L.R. 1314 (1927); 1A A. Corbin, Corbin on Contracts § 272 (1963); City of Birmingham v. Forney, 173 Ala. 1, 55 So. 618 (1911); Ross v. Parks, 93 Ala. 153, 8 So. 368 (1890). However, there is also authority for the proposition that if, by the nature of the personal property subject to the option, the optionee would be entitled to specific performance against the optionor, he should also be entitled to specific performance against a third-party purchaser of the property with notice of the option. In their one-volume treatise on contracts, Williston and Thompson explain the reasoning behind the specific enforceability of options and why it should apply equally to personalty:
"[I]f consideration is paid for an offer,... the offer is a contract.... Such contracts are generally called options.
"... It has been suggested that in such cases the offeror has the power to revoke his offer, thereby rendering himself liable in damages, not on the main contract which he offered to enter into but on the subsidiary promise to leave his offer open. Since, however, the agreement on the part of the offeror that his offer shall remain open can readily be enforced, and the intention of the parties carried out by simply regarding the offer as irrevocable during the agreed period, it is hard to find a good reason why the law should not thus specifically enforce the contract; and in fact, without regard to whether the offeror expressly promised for consideration to leave his offer open for a fixed period by a collateral promise, or simply made the main promise in the offer, though conditional upon some future performance, binding by present consideration, the courts in both cases have held the offer irrevocable....
"Most of the cases cited on the point relate to options for the sale of land, and the suggestion is possible that as the contract proposed by the offer in such a case would be specifically enforceable because it relates to land, the subsidiary contract to keep the offer open might also be specifically enforced, without admitting that such subsidiary agreements are specifically enforceable when the offer is of a different character. But none of the cases takes this distinction and there is authority for the same rule in the case of an offer to sell chattel property."
(Footnotes omitted.) (Emphasis added.) S. Wiliston and G. Thompson, Selections from Williston's Treatise on the Law of Contracts § 61, at 71-72 (rev. ed. 1938). See also 1A A. Corbin, Corbin on Contracts § 269, at 559-62 (1963):
"It is almost universally held that the option giver's promise may be accepted and become enforceable both at law and in equity, even though before any so-called acceptance by the option holder one of those events occurs that are legally sufficient to revoke an offer. ... [T]he holder may enforce the contract even though his acceptance is subsequent to a notice of revocation and a sale to some third person who had notice of the option...."
(Emphasis added.) Our own cases, while specifically involving options or contracts to purchase land, do not expressly restrict the rule of specific enforceability stated therein to such agreements concerning land. In Meyer Bros. v. Mitchell, 75 Ala. 475, 480 (1883), the rule is stated thusly:
"The rule is, that when specific performance of a contract would be decreed between the original parties to the instrument, it will also be decreed between all persons claiming by privity under them, unless there be some intervening equity to prevent. A purchaser with notice stands in the shoes of his vendor, and holds his acquired title as a trustee, subject to preexisting equities or incumbrances. Sawyers v. Baker, 66 Ala. 292; Brewer v. Brewer, 19 Ala. 482; Willard's Eq.Jur. 298-99."
In Ross v. Parks, 93 Ala. at 155-56, 8 So. at 369, the Court stated the general rule and applied it to the option contract in that case involving land:
"A general rule governing cases of specific performance is that the contract must be mutual, and that either party is *36 entitled to the equitable remedy of a specific performance. Exceptions to this general rule are well established, and one class of contracts to which the exceptions may be applied are those which are unilateral in form. Pom.Cont. §§ 167, 168.
"The exception as to unilateral contracts has been fully recognized and adopted in this state. The case of Moses v. McClain, 82 Ala. 370, 2 South.Rep. 741, was for a specific performance of the following contract: `For and in consideration of the sum of one dollar in hand paid, I do hereby give A.J. Moses an option on my lands and improvements situated near Sheffield and known as my "House Place," containing one hundred and twenty acres, more or less, for the sum of eight thousand dollars. * * * This option good for 2 days'; signed `J.W. McCLAIN.' It was contended that Moses, the covenantee, bound himself by no writing, and not having bound himself, he could not in this proceeding hold McClain bound: that the contract not being mutually binding, chancery will not compel its specific performance. The court declared as follows: `Mutuality is frequently said to be one of the conditions of a rightful suit for specific performance. The authorities, however, do not carry it to the length contended for. Where the contract is fair, just, and reasonable in all its parts, and the party sought to be charged has so bound himself as to meet the requirements of the statute of frauds, the election of the other contracting party to treat the contract as binding, and to enforce it meets all the requirements of the rule....'

". . .
"It may be stated as a sound principle of law, if an owner of land in writing gives another an option on land for a valuable consideration, whether adequate or not, agreeing to sell it to him at a fixed price, if accepted within a specified time, it is binding upon the owner, and upon those who purchase from the owner with a knowledge of such agreement.  Moses v. McClain, 82 Ala. 370; [Johnson v. Tripee ], 33 Fed.Rep. [530]; Maull v. Vaughan, 45 Ala. 134, and authorities.
"Under such circumstances, the fixed time is a material part of the contract, and when supported by a valuable consideration, the owner of the land cannot revoke the offer before the time has expired within which the offer may be accepted...." (Emphasis added.)
And, in City of Birmingham v. Forney, 173 Ala. at 3, 55 So. at 618-19, also involving an option to purchase land and a claim for specific performance against the optionor's grantee, the Court held as follows:
"If the appellant's grantor had not parted with the legal title to the land, no one would question the right of the appellee, on the facts averred in the bill, to compel such grantor, in a bill for that purpose in a court of equity, to convey title to the appellee. The respondent, the appellant here, having purchased the land with full knowledge of the existing contract of its grantor and of the appellee's rights as alleged in the bill, can occupy no higher ground than its grantor. In equity it simply takes the place of its grantor in respect to the appellee's rights. [Citations omitted.]
"The fact that the appellee may have a remedy at law against the appellant's grantor for a breach of contract does not take away appellee's equitable remedy to compel specific performance of the contract by such grantor's vendee." (Emphasis added.)
In the later case of Boozer v. Blake, 245 Ala. 389, 17 So.2d 152 (1944), this Court analogized the above-stated principles to the case where a corporation's president sold all of the corporate assets to third parties in violation of a stock purchase agreement between the complainant and the stockholders of the corporation. The Court held that the trial court erred in sustaining a demurrer to the complainant's bill for specific performance against the third-party purchasers. In so holding, the Court made the following observation, citing Forney v. City of Birmingham, supra, and other cases:

*37 "Here the status is similar to one where an owner agrees to sell all his property to another, and then in violation of his agreement sells to a third person with notice. The third person's interest is subject to divesture in the decree for specific performance. Matthews v. Bartee, 209 Ala. 25, 95 So. 289; Forney v. City of Birmingham, 173 Ala. 1, 55 So. 618; Bentley v. Barnes, 162 Ala. 524, 50 So. 361."
(Emphasis added.) 245 Ala. at 394, 17 So.2d at 156.
Under the above authorities, we see no reason that the rule allowing specific performance against a third-party purchaser with notice of an outstanding option should be limited to options for the purchase of land. Assuming the option holder can establish that he is entitled to the remedy of specific performance of the option to purchase personalty, that remedy is available against a third party who purchases from the optionor with notice of the option. In other words, if an optionee is entitled to specific performance, he is entitled to enforce that remedy against a purchaser with notice of the option. In addition to the above cited authorities, we find the following principles set out in Corbin on Contracts, supra, § 272, equally applicable to stock options for which specific performance may be decreed:
"As has heretofore been stated, the holder of an option to buy land has a conditional right to a conveyance, a power to turn that right into an unconditional right to immediate conveyance by performing the conditions, an immunity from revocation by the option given, and the legal privilege of performing or not performing the conditions at his option. During the agreed term of his option, he has a right that the option giver shall not repudiate or make performance impossible or more difficult by conveying the land to a third person. These rights are enforceable by all the usual judicial remedies, including judgment for damages, injunction, and decree for specific performance. It is beyond question that those who have bought and paid for an option on the land believe that they have something on which they can rely...."
"In view of the foregoing, it seems very clear that the option holder should have rights against third persons also, to the effect that they shall not interfere with performance by the promisor by contracting with him or by accepting from him a deed of conveyance in breach of his duty to the option holder.
"Just as in the case of contracts for the purchase of land that are not option contracts, a purchaser for value without notice of the option holder's rights is equally worthy of protection by the courts and in equal need of it. If such a purchaser gets a deed of conveyance, the option holder has no remedy against him and must proceed against the option giver for such reparation as may be possible. But as against a third person who is not an innocent purchaser for value, the option holder should have exactly the same rights and remedies as has any other person who has a contract to buy the land; the existence of the `option'the privilege to perform or not to perform the conditionsshould make no difference. This is supported by the greater number of decisions. The reason is not that the option holder has an `interest' in the land, but because he has contract rights that ought to be respected by third persons. It is as a result of this and not as a reason for it, that we may properly say that the option contract has created an equitable interest in the land...."
(Footnotes omitted.) (Emphasis added.) Id. at 579-82.

VII.
Appellees next contend that they were entitled to summary judgment because McMillan's claim for specific performance is barred by the equitable defenses of waiver, acquiescence, estoppel, and unclean hands. Appellees correctly state the general rule:
"[T]he right of a person to specific performance of his contract may be lost by his abandonment thereof, by his acquiescence *38 in a breach of it, or by conduct inconsistent with the right to relief, which amounts to a waiver or an estoppel. Dean v. Sneed, 392 So.2d 1169."
Henderson v. Winkler, 454 So.2d 1358, 1361-62 (Ala.1984). Nevertheless, the viability of each of these defenses is a factual determination that must be left to the trier of fact unless only one reasonable inference can be drawn from the evidence. See Draughon v. General Finance Credit Corp., 362 So.2d 880 (Ala.1978); Imperial Group, Ltd. v. Lamar Corp., 347 So.2d 988 (Ala.1977); Nelson v. Vick, 462 So.2d 935 (Ala.Civ.App.1984); Upchurch v. Goodroe, 242 Ala. 395, 6 So.2d 869 (1942); Van Antwerp v. Van Antwerp, 242 Ala. 92, 5 So.2d 73 (1941). Compare Henderson v. Winkler, supra, and Dean v. Sneed, 392 So.2d 1169 (Ala.1981). It is sufficient to state that genuine issues of material fact clearly exist as to the assertion of each of the above defenses. And, construing the evidence most favorably toward McMillan, as we must in reviewing the grant of summary judgment for appellees, we cannot say, as a matter of law, that McMillan waived its option rights; acquiesced in the breach of the option contract; is estopped from seeking specific performance of the option; or, through its conduct, should be charged with having "unclean hands" within the meaning of that doctrine. We, therefore, cannot affirm the summary judgment on account of appellees' affirmative defenses.
Based on the foregoing, we conclude that the judgment below is due to be reversed and the cause remanded for further proceedings.
APPLICATION GRANTED; OPINION EXTENDED; REVERSED AND REMANDED.
TORBERT, C.J., and JONES, ALMON, SHORES, HOUSTON and STEAGALL, JJ., concur.
BEATTY, J., dissents from holding that cross-appeal by appellees was not required, but concurs in result of the opinion on rehearing reversing summary judgment for appellees with opinion in which MADDOX, J., joins.
ADAMS, J., not sitting.
BEATTY, Justice (dissenting from holding that cross-appeal by appellees was not required, but concurring in result of the opinion on rehearing reversing summary judgment for appellees).
In granting rehearing in this case to hold that a cross-appeal by appellees was unnecessary, despite express rulings below adverse to appellees, the majority purports to summarily distinguish the many cases cited in this Court's opinion on original deliverance that hold to the contrary.
Without analysis, the majority states that none of those cases "deals with this precise issue," and it concludes that in all of those cases, the appellees were seeking to alter the judgment so as to enlarge their rights. Even a superficial reading of the cases reveals that, in substance, there is no distinction between this case and those cited. Of course, it is the prerogative of this Court to overrule its decisions and establish a cross-appeal rule that parallels the rule prevailing in the federal system. Nevertheless, in choosing to do so, the majority should at least be forthright in its analysis and recognize that, by its opinion today, it is overruling earlier decisions to the contrary. The majority, however, offhandedly states that this case is different from all the cases cited on original deliverance, ignoring the fact that the rule as stated in those cases calls for a result different from that which it reaches today on the cross-appeal requirement. I, therefore, feel it necessary to apprise the practicing bar that, regardless of the distinction the majority professes to see between this case and the other decisions on this issue, the majority's opinion effectively vitiates the efficacy of those decisions, albeit sub silentio.
At the outset, in order that the precedential or controlling effect of prior decisions on the cross-appeal issue will be clear, I reiterate what transpired in the trial court in the present case.
*39 In their answer to McMillan's complaint seeking, among other things, specific performance of an option to purchase stock, Howell and Warrior denied any claim McMillan had to the stock in question, and pleaded several affirmative defenses. Thereafter, McMillan moved for partial summary judgment, as did Howell and Warrior, with respect to McMillan's right to purchase the stock. The trial court entered an order granting Howell and Warrior's motion, finding that McMillan had failed to timely and effectively exercise its option. Subsequently, at the specific request of all the parties, the trial court entered another order, extending its prior order to address the merits of the other defenses raised by Howell and Warrior in their answer. In a lengthy extended order, the trial court ruled in favor of McMillan and adverse to Howell and Warrior with respect to these defenses.
Specifically, the trial court found that (1) the Statute of Frauds defense was without merit; (2) the unexercised option was an "interest in the security" within the meaning of "adverse claim" under § 7-8-301, Code of 1975; and (3) because Howell took delivery of Tucker's stock with notice of the unexercised option, it was not a bona fide purchaser and, therefore, acquired only those rights in the securities that Tucker had. The trial court concluded its amended order with the following:
"Accordingly, the court therefore holds that should McMillan be held to have validly and timely exercised its option and, further, that McMillan is not barred by estoppel or laches of its right to exercise it, the Uniform Commercial Code defenses of Howell present no defense to McMillan's claim. The Court, therefore, rules that Tucker's defenses presented by summary judgment and not ruled upon by the Court in the final judgment entered here, are denied." (Emphasis added.)
On July 17, 1985, McMillan filed its notice of appeal from this amended final order. No cross-appeal was filed by Howell or Warrior. On original deliverance, citing a long line of Alabama authority, we held that a cross-appeal by Howell and Warrior was necessary in order to invoke this Court's jurisdiction to review the specific rulings made by the trial court in its extended order adverse to Howell and Warrior as to the other defenses raised by them.
In support of their application for rehearing, Howell and Warrior cite to this Court the statement in the footnote in Century 21 Preferred Properties, Inc. v. Alabama Real Estate Comm'n, 401 So.2d 764 (Ala. 1981), quoted in a footnote in the majority's opinion on rehearing. This case was not cited by appellees in their original brief, yet the dictum in that footnote is the only Alabama "authority" for the rule the majority now adopts. Appellees argue on rehearing that the "former" Alabama cross-appeal rule, represented by the cases discussed infra, creates a "trap" for unwary lawyers. The irony in this argument is that in Century 21, supra, the source of the obiter dictum which the majority now adopts, the appellees did in fact file a cross-appeal!
In reaching the decision to review, without a cross-appeal, the grounds ruled against by the trial court yet argued by appellees to support the grant of summary judgment, the majority, relying on Boyd v. Brabham, 414 So.2d 931 (Ala.1982), and Bank of the Southeast v. Koslin, 380 So.2d 826 (Ala.1980), states that "we will affirm a grant of summary judgment if it was properly granted notwithstanding the fact that the trial court gave the wrong reasons for granting the judgment." For aught that appears, however, in neither of those cases did the trial court expressly reject the "right reasons" or rule against the appellee on the other grounds advanced in support of the motion for summary judgment and then expressly base its judgment on the "wrong reasons." Thus, in neither of those cases were there adverse rulings from which an appeal by appellee would lie. In this case, however, the trial court expressly and formally ruled against appellees' affirmative defenses, and it is because of these adverse rulings that a cross-appeal by appellees was necessary in order to preserve this Court's review of them.
*40 The distinction the majority claims exists between the case sub judice and the many cases cited on original deliverance is that, in those cases, without filing a cross-appeal, the appellees were somehow attempting to obtain "more" than they had received from the judgment in their favor below. Here, the majority states that appellees are merely "seek[ing] to argue grounds other than those relied upon by the trial court" to support the judgment below. While it may be true factually that in some of the cases in which a cross-appeal was held to be necessary, the appellees were attempting to enlarge their remedy, it is not true of all the cases cited upon original deliverance. Moreover, this "distinction" is not a basis nor a reason for any of the holdings in those decisions requiring a cross-appeal, nor is it in any way incorporated into the analysis of the general rule repeated and applied throughout the decisions. I will begin by an analysis of the cases that are in substance indistinguishable from the case at bar.
One case cited by McMillan, but not cited by this Court on original deliverance, is Trailway Oil Co. v. City of Mobile, 271 Ala. 218, 122 So.2d 757 (1960), a case completely indistinguishable from the present case as to the requirement of a cross-appeal from adverse rulings. In Trailway Oil Co., the plaintiffs brought a declaratory judgment action seeking to have declared valid Act No. 80, Acts of Alabama 1956, Vol. 1, p. 115. Plaintiffs further sought to enjoin the City of Mobile from exercising its police jurisdiction within Baldwin County. The City of Mobile responded by contesting the constitutionality of Act No. 80 under §§ 104, 105, 106, and 108 of the Constitution of Alabama of 1901 and the Fourteenth Amendment to the Constitution of the United States. In its order, the trial court decreed that Act No. 80 was unconstitutional in that it violated §§ 104 and 106 of the Alabama Constitution. However, the trial court further decreed that Act No. 80 "did not violate any provisions of the Fourteenth Amendment of the federal Constitution or §§ 105, or 108 of the state Constitution." (Emphasis added.) Trailway Oil Co., supra, 271 Ala. at 221, 122 So.2d at 759. From the denial of their declaratory and injunctive relief, the plaintiffs appealed. The City of Mobile did not cross-appeal, and, therefore, in response to the City's attempt to argue that the trial court's judgment should be affirmed because Act No. 80 violated §§ 105 or 108 of the Alabama Constitution, or the Fourteenth Amendment, this Court held that holdings of the trial court with respect to these arguments were not presented for review:
"At the outset it is expedient for us to point out that there is nothing before this court for review as to the correctness of the lower court's holding that the act under attack was inoffensive to the Fourteenth Amendment of the federal Constitution, or Sections 105 and 108 of the state Constitution. Those matters, of course, would be for appellee to raise, if so desired, appropriately by cross-appeal or cross-assignments of error, which it did not do. Ford Motor Co. v. Hall Auto Co., 226 Ala. 385, 147 So. 603; Roach v. Olive, 208 Ala. 612, 95 So. 23."
(Emphasis added.) 271 Ala. at 221, 122 So.2d at 759-60.
In substance, there is absolutely no difference between Trailway Oil Co. and the present case. In Trailway Oil Co., the trial court ruled in favor of the City, but, nevertheless, expressly rejected several arguments made by the City to support the judgment. Here, the trial court ruled in favor of appellees, Howell and Warrior, but expressly rejected several arguments made by appellees to support their judgment. Trailway Oil Co. is cited by McMillan in its brief, yet no mention of that case is made by the majority in its opinion on rehearing. Nevertheless, the rehearing opinion can only be interpreted as overruling Trailway Oil Co.
Price v. South Central Bell, 294 Ala. 144, 313 So.2d 184 (1975), is another case which is indistinguishable from the present case, and which must also be deemed overruled by the majority's opinion. In Price, this Court held that an appellee must file a cross-appeal in order to raise alternate *41 grounds in support of a favorable disposition below where the trial court ruled adversely to appellee on those grounds. The trial court in Price had denied the telephone company's motion to dismiss, but after a trial on the merits, the trial court concluded the plaintiffs were not entitled to any relief and dismissed their complaint with prejudice. We explained:
"At the trial, the telephone company moved to dismiss the suit against it on the ground that the action is not prosecuted in the name of the real party in interest. The basis for this motion is that the telephone service in issue is listed in the name of the Prices' family corporation, Mandarin Management, Inc., and not in the name of the Prices individually. The trial court denied the motion.

"The telephone company now contends, on this appeal by the Prices, that even though we find the trial judge's findings were erroneous, on the merits, he reached the right result because the action should have been dismissed for failure to prosecute the suit in the name of the real party in interest. Rule 17(a), A.R.C.P. Therefore, it argues, the judgment of dismissal should be affirmed. We disagree.
"The ruling of the trial court on appellee-telephone company's motion was adverse to it. If an appellee wishes to have rulings of the trial court adverse to it reviewed, an appellee must either take a cross-appeal or cross-assign errors upon the record brought up by the appellant. Tit. 7, § 746, Code of Alabama 1940 (Recompiled 1958); Rule 3, Revised Rules of the Supreme Court of Alabama; see also cases collected in 2A Alabama Digest, Appeal and Error, Key No. 747(2).
"Since the matter is not raised nor the issued presented to us, we will neither consider nor express any opinion upon the correctness of the trial court's ruling on the Rule 17 motion."
The appellee telephone company in Price was not attempting to enlarge its rights or to seek more than it had obtained below. It merely sought to argue a basis for affirming the trial court's dismissal of plaintiffs' action, albeit a basis expressly rejected by the trial court. How can Price be distinguished from the present case? It cannot, except to say that Price involved a dismissal whereas this case involves a summary judgment, and this difference is not one of substance on the cross-appeal issue.
The crux of the cross-appeal issue, as it has been decided in Alabama cases, is whether the appellee is attempting to make an argument expressly rejected by the trial court in the form of an adverse ruling. That is precisely what is involved in this case, as it was in Trailway Oil Co., supra, and Price, supra. There are many other cases to the same effect, as the following synopses show: Protective National Ins. Co. of Omaha v. Bell, 361 So.2d 1058 (Ala. 1978) (on appeal by employee's insurer from declaratory judgment that it, rather than the employer's insurer, was the primary carrier, this Court held that, without a cross-appeal, employer's insurer/appellee could not argue that the trial court erred in holding that the employee was acting within the employer's permission, a finding adverse to appellee); Johnson v. Haynie, 414 So.2d 946, 949 (Ala.1982) (on plaintiff's appeal from JNOV or new trial entered for defendant, this Court held that because defendants never perfected an appeal, "they cannot argue for relief from the adverse [evidentiary] ruling of the trial court"); Headley v. Housing Authority of Prattville, 347 So.2d 532 (Ala.Civ.App. 1977) (where appellee's motion to dismiss on the ground of sovereign immunity was denied, appellee could not raise that ground without a cross-appeal where trial court had dismissed plaintiff's complaint on the ground that it was barred by the statute of limitations); First Alabama Bank of Montgomery v. Parsons, 390 So.2d 640 (Ala.Civ.App.1980) (appellee, for whom verdict was directed below, could not raise, without filing a cross-appeal, propriety of trial court's denial of appellee's motion to dismiss or transfer). See also Dickerson v. Stewart, 473 So.2d 1078 (Ala.Civ.App.1985).
*42 While in certain other cases, the appellees were, to some extent, seeking to gain more than they had received by the judgment below, those attempts by appellees to enlarge their remedies did not form the basis of the Court's rationale in requiring cross-appeals in those cases. See Beaty v. Head Springs Cemetery Ass'n, Inc., 413 So.2d 1126 (Ala.1982); Mutual Savings Life Ins. Co. v. Montgomery, 347 So.2d 1327 (Ala.1977); State v. Southland Hatchery, 253 Ala. 449, 45 So.2d 302 (1950); State Dept. of Industrial Relations v. Deslattes, 372 So.2d 867 (Ala.Civ. App.), cert. denied, 372 So.2d 872 (Ala. 1979); Boswell v. Samson Banking Co., 368 So.2d 547 (Ala.Civ.App.1978), cert. denied, 368 So.2d 552 (Ala.1979); Hudson v. Durawear Corp., 344 So.2d 182 (Ala.Civ. App.1977).
As the foregoing analysis shows, the cross-appeal rule embraced today by a majority of this Court is new to the jurisprudence of this state. I would adhere to the rule longstanding in this state not only in the interest of stare decisis, but also especially in view of the total absence of any compelling reason whatsoever to abandon that rule. Our cases are clear on the circumstances necessitating a cross-appeal. And, in this case, where the parties deliberately went back to the trial court to get express rulings on the other defenses raised, it is difficult to perceive the purpose for doing so if the appellee did not wish to obtain rulings to raise for review by cross-appeal. In any event, changing the law of cross-appeal in this case does not change its result at all. Indeed, it is unfortunate that a majority of this Court would grant rehearing in this case and issue an opinion effecting a major change in Alabama law, thereby overruling numerous decisions, when it does not change the outcome of this case. For these reasons, I would overrule appellees' application for rehearing.
MADDOX, J., concurs.
NOTES
[1] As will be shown, Tucker played a managerial role in later negotiations with Howell. The record is unclear on that point; however, no issue is made thereon.
[2] See also Century 21 Preferred Properties, Inc. v. Alabama Real Estate Comm'n, 401 So.2d 764 (Ala.1981), where we said in footnote 4, at 767:

"While for the sake of convenience, we have retained Appellees' designation of their res judicata contention as a `cross-appeal,' in a technical sense this designation is a misnomer. The trial court, after rejecting Appellees' res judicata plea, nevertheless ruled adversely to Appellants on the substantive issue as to the validity of the `50:50' Rule, thus denying all relief sought by Appellants (Plaintiffs below). Appellees, therefore, do not seek a reversal as to any aspect of the final judgmenta necessary ingredient of a cross-appeal."
While the footnote is dictum in that there was no question presented as to whether the res judicata contention could be considered by this Court, the footnote is a correct statement of the law.
[3] In its amended order, the trial court stated that its holding (viz., that McMillan's unexercised option "is an `interest in the security' pursuant to § 7-8-301(1)") is "in accordance with Official Comment, Note 1 to [Code of 1975] § 7-8-204, which provides that a purchaser with actual knowledge of an unnoted restriction on the security has notice of an adverse claim." In its brief, McMillan also contends that, under § 7-8-204, its option constitutes a valid restriction on transfer effective against Howell because Howell took delivery of the stock with actual knowledge of the option. We find these references to § 7-8-204 to be misplaced because that section deals only with restrictions imposed by the issuer (i.e., Warrior); it is not applicable to other restrictions, such as those placed on transfer by a separate agreement of a stockholder (i.e., Tucker's option agreement with McMillan). See 7 Hawkland, Alderman & Schneider, UCC Series, § 8-204:02 (Art. 8) (1986).